**TEXAS BEEF GROUP, Perryton Feeders, Inc., Maltese Cross Cattle Company, Bravo Cattle Company, Alpha 3 Cattle Company, Paul F. Engler, Cactus Feeders, Inc., Cactus Growers, Inc., and Dripping Springs Cattle Company, Plaintiffs,**

v.

**Oprah WINFREY, Harpo Productions, Inc., and Howard Lyman, Defendants.**

No. CIV.A. 2:96–CV–208–J.

United States District Court,
N.D. Texas,
Amarillo Division.

Feb. 27, 1998.

David Christopher Mullin, Vincent Earl Nowak, Mullin Hoard & Brown, Amarillo, TX, for Plaintiffs Texas Beef Group, Perryton Feeders Inc., Maltese Cross Cattle Co., Bravo Cattle Co., Alpha 3 Cattle Co., Dripping Springs Cattle Co.

Joseph F. Coyne, Jr., Michael J. St. Denis, Sheppard Mullin Richter & Hampton, Los Angeles, CA, Kevin A. Isern, Law Office of Kevin A. Isern, Amarillo, TX, for Plaintiff Cactus Growers Inc., Paul F. Engler.

Charles L. Babcock, Nancy Wells Hamilton, Jackson Walker, Dallas, TX, Robert E. Garner, Garner & Stein, Amarillo, TX, for

Defendants Oprah Winfrey, Harpo Productions Inc.

Barry Don Peterson, Peterson Farris Doores & Jones, Amarillo, TX, for Defendant Howard Lyman.

### AMENDED ORDER

MARY LOU ROBINSON, District Judge.

Plaintiffs Texas Beef Group, Perryton Feeders, Inc., Maltese Cross Cattle Company, Bravo Cattle Company, Alpha 3 Cattle Company, Paul F. Engler, Cactus Feeders, Inc., Cactus Growers Inc., and Dripping Springs Cattle Company sue Defendants Oprah Winfrey, Harpo Productions, Inc., and Howard Lyman alleging causes of action for: (1) False disparagement of perishable food products, in violation of Texas Civil Practice and Remedies Code Section 96.002; (2) common law business disparagement; (3) common law defamation; and (4) negligence and negligence per se.[1] The cause of action arises out of an Oprah Winfrey show taped on April 11, 1996, and aired on April 16, 1996, which included a segment on Bovine Spongiform Encephalopathy (BSE).

Defendants contend that Plaintiffs failed to adduce evidence on at least one essential element of each cause of action. At the close of Plaintiffs' case, the Court granted judgment as a matter of law on all claims except common law business disparagement.

### Background

On March 20, 1996, British Health Minister Stephen Dorrell announced to the House of Commons that a committee of scientists had linked a deadly, degenerative brain disease in cattle known as Bovine Spongiform Encephalopathy (BSE) with a invariably fatal new variant of the human disorder known as Creutzfeldt–Jakob Disease (CJD). Minister Dorrell announced that British researchers

had further determined that consumption of beef was "the most likely explanation" for this new variant CJD (V–CJD). Both BSE and the human CJD are forms of Transmissible Spongiform Encephalopathy (TSE) which is characterized by the formation of holes in the brain creating a sponge-like appearance of brain tissue. It is always fatal.

BSE is commonly referred to as "Mad Cow Disease." It was first diagnosed in cattle herds in Great Britain in 1986. BSE is an infectious neurologic disorder of cattle whose rapid spread in some countries, particularly Great Britain, is believed to have been caused by the feeding of certain infected cattle and sheep tissues to cattle in the form of "ruminant" derived protein supplements. Ruminant animals are animals with split hooves, multiple stomachs, and which chew a cud. Cattle are ruminant animals. Since its discovery in Great Britain, BSE has been diagnosed in cattle herds in the Republic Ireland, Switzerland, France, Oman, Portugal and in other European countries. One case was diagnosed in Canada in a cow imported from Great Britain. BSE has never been diagnosed in the United States cattle herd, nor has new variant CJD been diagnosed in the U.S.

On March 22, 1996, two days after the British announcement, the Animal & Plant Health Inspection Service (APHIS) of the United States Department of Agriculture (USDA) called an emergency meeting to explain the information coming out of Great Britain on Mad Cow Disease and to answer questions.

On March 29, 1997, the USDA and the National Cattlemen's Beef Association (NCBA) announced a voluntary ban on feeding ruminant-derived proteins to ruminant animals.

---

1. Prior to the close of discovery, Defendants' motions for summary judgment were denied to afford Plaintiffs full opportunity to conduct discovery. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On December 16, 1997, just one month prior to trial, the court granted Plaintiffs' motion to take the deposition of a former employee of Harpo Productions, Inc. Discovery for all purposes in this matter ended on December 19, 1997. Analysis of the issues presented in this case requires the court to consider the United

States Supreme Court's reservation of the standard of proof in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and the quantum of proof in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783, (1986). Recognizing other questions would have to be tried and the evidence required would be the same, and in the interests of judicial economy, this court allowed the Plaintiff's to present evidence at trial on all three causes.

On April 2 and 3, 1996, the World Health Organization convened a two-day session to discuss Mad Cow Disease and issued a report stating, in part: "All countries should ban the use of ruminant tissues in ruminant feed."

On April 8, 1996, representatives from the Centers for Disease Control and Prevention, (CDC), the National Institutes of Health (NIH), the Food and Drug Administration (FDA), the USDA, and the United States Department of Defense held a meeting to share information about the British announcement of the suspected link between BSE and the new variant of CJD in Britain. The parties have stipulated to the facts attached as Appendix A.

The British Health Minister's announcement generated numerous reports in the United States. Print media reports included: A March 21, 1996, New York Times article announced "Britain Ties Deadly Brain Disease to Cow Ailment." On March 28, 1996, The Wall Street Journal ran an article entitled, "Agriculture Officials Say Mad–Cow Risk Is Small in U.S. but Don't Rule It Out." An April 5, 1996, New York Times article that quoted an expert estimating that "a teaspoonful of highly infective cattle feed is enough to cause mad-cow disease." An April 8, 1996, Newsweek headline read, "Mad Cow Disease in the U.S.? Don't panic, but one version's already here." Television reports included: A March 14, 1996, *Dateline* report on Mad Cow Disease which included video of a CJD victim hospitalized in New York. On March 22, 1996, CNBC's *America's Talking* aired a segment on Mad Cow Disease which featured a debate between Dr. Gary Weber and Howard Lyman. The CNBC program attracted the attention of staffers on *The Oprah Winfrey Show* to Weber and Lyman as prospective guests for the "Dangerous Foods" program.

On June 5, 1997, 14 months after the "Dangerous Food" segment aired the FDA published the final rules on a ruminant-to-ruminant feed ban. That ban became effective on August 4, 1997.

### The Show

On April 16, 1996, *The Oprah Winfrey Show* broadcast a program entitled "Dangerous Food" which included a segment on BSE. A transcript of the show as it aired is attached as Appendix B. The show was taped on April 11, 1996. It was then edited to fit within a 42 minute and 30 second timeframe. Only the portion of the show discussing BSE is challenged by the Plaintiffs.[2]

The show began with a discussion of BSE in England. A guest for this segment was Beryl Rimmer, from England, whose granddaughter was in a coma suffering from a form of CJD. Ms. Rimmer believed that her granddaughter contracted CJD from eating hamburger tainted by BSE. She was critical of what she believed has been a cover-up by the British government of the link between BSE and CJD.

The second segment considered the question, "Could it happen here?" Guests in connection with that segment included Dr. Gary Weber, a representative of the National Cattleman's Beef Association; Dr. William Hueston from the U.S Department of Agriculture; and Defendant Howard Lyman, a former cattle rancher-turned-vegetarian who is executive director of the Humane Society's Eating With Conscience campaign. Lyman vigorously asserted the need for a mandatory ban on ruminant-to-ruminant feeding and stated that the United States is at risk of an outbreak similar to that in England, if the practice continued. Weber and Hueston argued that U.S. beef is safe because BSE does not exist in the United States and that the United States has carefully monitored the

2. After the BSE segment, the program discussed the dangers of *Escherichia coli (E. coli)* contamination from eating beef that is not fully cooked. Guests for this segment included a heartbroken father whose young child died from *E. coli* poisoning contracted when the father fed his child the edges of a hamburger that was not fully cooked in the middle. Another guest was a young woman who was hospitalized after she contracted *E. coli* poisoning from lettuce in a Ceasar salad.

Other segments included: Food handling tips, a health inspection of a Chicago restaurant, and discussions about the hazards of eating oysters, drinking diet herbal tea, and the safety of drinking water supplies.

Plaintiffs do not challenge these segments of the program.

situation for 10 years. The program did not mention Texas or name any of the Plaintiffs.

### Plaintiffs' Contentions

The Plaintiffs are cattlemen operating in the Panhandle of Texas. In the Pretrial Order, filed December 29, 1997, Plaintiffs claim that the "Dangerous Food" show was "nothing more than a 'scary story', falsely suggesting that U.S. beef is highly dangerous because of Mad Cow Disease and that a horrible epidemic worse than Aids could occur from eating U.S. beef." Plaintiffs claim that Defendant Lyman is "a vegetarian activist and lobbyist, with an agenda to wipe out the U.S. Beef industry" and that Defendant Harpo "intentionally edited from the taped show much of the factual and scientific information that would have calmed the hysteria it knew Lyman's false exaggerations would create." They further claim that Harpo "maliciously edited most of Drs. Hueston's and Weber's statements out of the show, so that Dr. Hueston's and Weber's scientific refutation of Defendant Lyman was never heard by Oprah's 20 million American TV viewers." Plaintiffs contend that the April 16, 1996, broadcast of *The Oprah Winfrey Show* caused beef markets to "immediately" crash and that they were damaged thereby.

### The First Amendment and Matters of Public Concern

Any consideration of the cause of action here is governed by the First Amendment to the United States Constitution and the decisions of the courts concerning what is required to pass constitutional muster. We consider this case "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). "Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982)).

The trial court is to determine whether the speech at issue in a case can "be fairly characterized as constituting speech on a matter of public concern" before further analyzing allegations of unconstitutional restrictions on speech. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

█ The speech in question dealt with a matter of public concern. Statements of fact and opinion on the issue of whether the feeding practices of American cattlemen on or before April 16, 1996, contributed to a danger that BSE or the deadly and incurable new variant CJD could occur in the United States, cannot be considered as anything other than a matter of legitimate public concern. It would be difficult to conceive of any topic of discussion that could be of greater concern and interest to all Americans than the safety of the food that they eat.

### False Disparagement Of Perishable Food Products Act

Chapter 96 of the Texas Civil Practice & Remedies Code is the *False Disparagement Of Perishable Food Products Act*. It provides:

In this chapter, "perishable food product" means a food product of agriculture or aquaculture that is sold or distributed in a form that will perish or decay beyond marketability within a limited period of time. (§ 96.001)

(a) A person is liable as provided by Subsection (b) if:

(1) the person disseminates in any manner information relating to a perishable food product to the public;

(2) the person knows the information is false; and

(3) the information states or implies that the perishable food product is not safe for consumption by the public.

(b) A person who is liable under Subsection (a) is liable to the producer of the perishable food product for damages and any other appropriate relief arising from the person's dissemination of the information. (§ 96.002)

In determining if information is false, the trier of fact shall consider whether the information was based on reasonable and reliable scientific inquiry, facts, or data. (§ 96.003)

■ Plaintiffs' product is sold *in the form of* live cattle. Live cattle are not generally perishable as perishable is defined in the statute. Plaintiffs contend, however, that fed cattle in a feedlot are a perishable food product because there is an optimal time for fed cattle to be marketed to the slaughter. There is evidence that live fed cattle may decay in the sense that as they age they may pass into a state of less perfection. For example, cattle in a feedlot, if fed beyond a certain point, may be less profitable because feed cost exceeds the price obtained for additional pounds gained, may be discounted by a buyer if they become fatter and are regarded as a lower quality, or may not be purchased by a particular buyer because the cuts are too large for that particular buyer's needs. There is also evidence that if the cattle's feed is controlled to prevent gain that the cattle might be discounted because their meat might then be of a lesser grade. None of this is evidence that live fed cattle fit within the carefully crafted statutory language which requires that the food product in question perish or decay "beyond marketability." The cattle in question are still marketable, although they may be less profitable, and in some cases not marketable to every buyer. Even assuming but not deciding that live cattle are a food product, Plaintiffs do not produce a food product that will perish or decay *beyond marketability* within a limited period of time.

■ Further, even if Plaintiffs' cattle were covered within the definition of a perishable food product under Chapter 96, Plaintiffs have failed to adduce evidence to go to a jury of another essential element. Chapter 96 requires that the disparaging statement be knowingly made. The requirement of a knowing mental state is the strictest standard in First Amendment jurisprudence. In crafting this standard, the Texas Legislature exceeded even the constitutionally required "actual malice" standard of knowledge or reckless disregard established in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct.

710, 11 L.Ed.2d 686 (1964) for defamation of public officials.

■ To withstand a Motion for Judgment as a Matter of Law, Plaintiffs must have presented substantial evidence of such quality and weight that reasonable and fair-minded jurors, in the exercise of impartial judgment, might reach a conclusion that Plaintiffs had actual knowledge of falsity, if indeed there was falsity. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969). Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such character that it would warrant the jury in finding a verdict in favor of that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448, 20 L.Ed. 867 (1871)). Plaintiffs have wholly failed in this burden. There is no evidence by which a reasonable juror could conclude that the Defendants had actual knowledge of the falsity, if any, of the statements made.

Indeed, Dr. Weber and Dr. Hueston themselves validated a substantial part of the program. At one point, Defendant Winfrey asked Dr. Hueston if Howard Lyman was an alarmist, in his opinion. Hueston replied:

Well I would say Howard is an example of what makes America the great country that it is now. And that is, we have the freedom for people to voice their opinions and different opinions and we believe that, that freedom of individual consumers and producers to raise ideas, is part [of] the system that keeps us the best.

In another exchange between Defendant Winfrey and Dr. Weber, who represented the National Cattleman's Beef Association, Ms. Winfrey asked if we are feeding cattle to cattle and Dr. Weber replied that there is a limited amount of that done in the United States.

### Common Law Defamation and Statutory Libel Claims

A defamation claim requires proof that the defendant in question published to a third person, in the absence of one of the applica-

ble privileges, a false statement of defamatory fact that was "of and concerning" the Plaintiff in question with the required degree of fault which proximately caused damage to the reputation of the Plaintiff in question. *Rosenblatt v. Baer,* 383 U.S. 75, 81, 86 S.Ct. 669, 673, 15 L.Ed.2d 597 (1966).

The Court held in *Rosenblatt* that the jury could not find liability by inference and without the constitutionally required "evidence that the asserted implication" of the published statement "was made specifically of and concerning" the plaintiff. Texas law imposes the same "of and concerning" standard before a plaintiff can state a defamation claim. *Newspapers, Inc. v. Matthews,* 161 Tex. 284, 339 S.W.2d 890, 894 (1960) (stating that "the settled law requires that the false statement point to the plaintiff and to no one else.").

Texas codified common law defamation: "A libel is a defamation expressed in written or other graphic form that tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury." Tex.Civ.Prac. & Rem.Code § 73.001 (1997).

The action for defamation is to protect the personal reputation of the injured party as distinguished from an action for disparagement which is to protect the economic interest of the injured party against pecuniary loss. *Hurlbut v. Gulf Atlantic Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987).

Even if a statement on the program could be construed to meet the statutory definition of defamation, it cannot meet the "of and concerning" requirement. None of the Plaintiffs were mentioned by name on the April 16, 1996 *Oprah Winfrey Show,* and it is stipulated that this program did not mention by name the State of Texas, the Texas Panhandle, or West Texas. Plaintiff Paul Engler testified that the statements made were about him "as well as the rest of the cattle

feeding industry." Engler also testified that there are "about a million" cattlemen in the United States and that the states of Kansas and Colorado have feeding operations similar to Cactus Feeders in Texas.

The Texas Court of Appeals has held "as a matter of law that an individual may not recover damages for defamation of a group or class in excess of 740 persons of which he is a member." *Webb v. Sessions,* 531 S.W.2d 211, 213 (Tex.Civ.App.—Eastland 1975, *no writ* ).[3] Therefore, Plaintiffs have failed as a matter of law to meet their burden of establishing the "of and concerning" element of the defamation cause of action.

*Negligence and Negligence per se*

Plaintiffs' asserted tort claims for negligence and negligence *per se* fail as attempts to claim additional tort recovery based on speech under less stringent standards than the defamation claims. *See Hustler Magazine v. Falwell,* 485 U.S. 46, 57, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988): *Eimann v. Soldier of Fortune Magazine, Inc.,* 880 F.2d 830, 838 (5th Cir.1989), *cert. denied,* 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990). The Texas Supreme Court has expressly refused to recognize causes of action that merely duplicate the remedy of defamation and are creatively pled in an attempt to avoid the constitutional protections mandated by the First Amendment and the Texas Constitution. *See, e.g. Cain v. Hearst,* 878 S.W.2d 577, 584 (Tex.1994) (refusing to recognize a cause of action for false light invasion of privacy because (1) it duplicates other rights of recovery, particularly defamation, and (2) it lacks many of the procedural limitations for defamation "thus unacceptably increasing the tension that already exists between free speech, constitutional guarantees and tort laws."). It would "be ironic if an individual could avoid all constitutional restrictions on defamation claims merely by disguising such claims in negligence terms." *Bird v. W.C.W.,* 868 S.W.2d 767, 772 n. 7 (Tex.1994).

Accordingly, the Court GRANTS Defendants' Motion for Judgment as a Matter of Law made at the close of Plaintiffs' case on the Chapter 96, defamation, and negligence claims. The Court DENIES Defendants'

---

**3.** *Webb* was brought as the result of a June 19, 1974 newspaper article printed in the Dallas Morning News that reported "petty thievery" and the acceptance of small bribes *but* the court found "did not refer to any individual by name and could not be construed to mean and include all of the deputies, agents and employees of the Dallas County Sheriff's Office." *Id.*

motion as to the Common Law Business Disparagement claim.

It is SO ORDERED.

## APPENDIX A

Jan. 21, 1998.

### PARTIES' NARRATIVE OF STIPULATED FACTS

This is a suit arising from statements made on the April 16, 1996, Oprah Winfrey Show. The plaintiffs are: Texas Beef Group, Perryton Feeders, Inc., Maltese Cross Cattle Company, Bravo Cattle Company, Alpha 3 Cattle Company, Paul F. Engler, Cactus Feeders, Inc., Cactus Growers, Inc., and Dripping Springs Cattle Company.

The defendants are: Oprah Winfrey, and the company which produces her television program, Harpo Productions, Inc., and Howard Lyman, who was a guest on the April 16, 1996, Oprah Winfrey Show. We will refer to this April 16 program as "The Program."

Bovine Spongiform Encephalopathy ("BSE"), commonly referred to as Mad Cow Disease, is a degenerative brain disease in cattle. It was first diagnosed in cattle herds in Great Britain in 1986. It was subsequently diagnosed in cattle herds in Ireland and some other countries on the European Continent. One case has been diagnosed in Canada in a cow imported from Great Britain. Mad Cow Disease has never been diagnosed in United States cattle.

In July of 1989, the United States government banned the importation of cows from countries with BSE in their cattle herd. That same year, 1989, the U.S. cattle industry instituted a voluntary ban on the sale of sheep offal as a meat and bone meal product to be included in U.S. cattle feed.

In 1990, the United States government formed a BSE management team.

On March 22, 1996, an emergency meeting was convened by the Animal & Plant Health Inspection Service ("APHIS") of the United States Department of Agriculture ("USDA"). The purpose of the meeting was to explain to all potentially affected or interested parties what the new information coming out of Great Britain on Mad Cow Disease was to answer questions.

On March 29, 1996, the National Cattlemen's Beef Association ("NCBA") and the United States Department of Agriculture ("USDA") announced a voluntary ban on feeding ruminant-derived proteins to ruminant animals. Ruminant animals are animals with split hooves, multiple stomachs, and which chew a cud. Cattle are ruminant animals.

On April 2 and 3, 1996, the World Health Organization convened a two-day session in Geneva, Switzerland regarding Mad Cow Disease and issued a report stating, in part: "All countries should ban the use of ruminant tissues in ruminant feed."

The April 8, 1996, edition of Newsweek contained an article on Mad Cow Disease entitled "Mad Cow in the U.S.?"

On April 8, 1996, representatives from the Centers for Disease Control and Prevention, the National Institutes of Health, the Food and Drug Administration, the United States Department of Agriculture, and the United States Department of Defense participated in a meeting to share information about the British announcement of the suspected link between BSE and the new variant of CJD in Britain. New variant CJD has not been diagnosed in the United States.

On April 16, 1996, The Oprah Winfrey Show broadcast a program entitled "Dangerous Food." That show was taped in Chicago, Illinois on April 11, 1996.

Dr. Gary Weber of the National Cattlemen's Beef Association, Dr. Will Hueston of the United States Department of Agriculture, and Defendant Howard Lyman of the Humane Society of the U.S. were on the Program.

On April 23, 1996, The Oprah Winfrey Show had a follow-up program on the "Dangerous Food" topic. Dr. Weber but not Mr. Lyman was a guest on the program.

On May 10, 1996, the U.S. Congressional committee on food safety convened hearings in Washington, D.C. concerning the outbreak of BSE in Great Britain.

On May 13 and 14, 1996, an international conference was held in Riverdale, Maryland, sponsored by the FDA and USDA.

On May 14, 1996, the FDA published at the Riverdale conference an advanced notice of proposed rule-making ("ANPRM") regarding proposed ban on ruminant feed to ruminants. On July 25, 1996, the Center for

Disease Control wrote saying that it urged the FDA "... to adopt a ruminant to ruminant feed prohibition." In July of 1996, the USDA recommended to the FDA a ruminant-to-ruminant feed. On January 3, 1997, the FDA proposed a ruminant-to-ruminant feed ban rule. The United States Food & Drug Administration has banned the practice of feeding ruminant protein to ruminants. On June 5, 1997, the FDA published the final rules on a ruminant-to-ruminant feed ban. That ban became effective on August 4, 1997.

All research, preparation and production for the April 16, 1996, Oprah Winfrey Show was done from Chicago, Illinois. The Program did not mention Texas or any region of Texas, such as West Texas or the Texas Panhandle. The Oprah Winfrey Show was broadcast in Texas.

## APPENDIX B

Harpo Productions, Inc
P O Box 909715
Chicago, IL 60690

P 1452

OPRAH
THE OPRAH WINFREY SHOW

DANGEROUS FOOD

April 16, 1996

©1996 Harpo Productions Inc
ALL RIGHTS RESERVED

# DANGEROUS FOOD

**Unidentified Reporter #1:** It is also known as mad cow disease, because it causes an animal's brain to deteriorate before death.

**OPRAH WINFREY:** The news stories are chilling

**Unidentified Reporter #2:** Ten cases of the fatal brain disease in humans were linked to the illness in cattle.

**WINFREY:** And this young English girl lies in a coma

**Ms. BERYL RIMMER (Says Granddaughter Is In Coma Because Of Mad Cow Disease):** She's blind and she can't move. It's just a living hell seeing her every day.

**Unidentified Reporter #3:** There could be tens of thousands of human deaths.

**WINFREY:** Could mad cow strike America?

**Dr. GARY WEBER (National Cattleman's Beef Association):** No animal can enter the plant that has any of these symptoms. It doesn't happen.

**Mr. HOWARD LYMAN (Humane Society's Eating With Conscience):** Come on. Let's get real. Any animal that is not staggering around goes in there.

**WINFREY:** That is alarming to me

You can't see the dangers in your food, but they can kill you. It wasn't as cooked as you thought?

**Mr. MICHAEL NOLE (Son Died From E. Coli Poisoning):** Throwing it away would have saved my son's life.

**Ms. DIANA NOLE (Son Died From E. Coli Poisoning):** This is killing our children—200, 300 a year.

**WINFREY:** Are you putting your family at risk? Thawing frozen food on your kitchen counter at room temperature. A food safety test that may save your life.

**Ms. CONNIE BEEKMAN (Nutrition Consultant):** Remember that little stomach upset you had that you thought was the flu? Guess what? It wasn't the flu.

**WINFREY:** Let me warn you: Today's show may cause you to diet for all the wrong reasons. We're talking about the hidden dangers in our food, possibly the food in your own refrigerator.

First, it's the biggest health scare to hit Europe since the Chernobyl nuclear disaster. Mad cow disease has stunned the world. Even though the United States has banned British beef since 1989, many people are panicked because it may take as long as 10 years, now, before mad cow symptoms occur.

Take a look at what is known about this disease

HAR 1642

*(Excerpt from video)*

WINFREY: (Voiceover) Mad cow disease. It's a medical mystery, spreading panic across the Atlantic. In England, 10 puzzling deaths of young people in recent years may be linked to a rare and fatal brain disorder in cattle. British scientists believe the victims may have eaten diseased beef as many as 10 years ago.

The afflicted cattle shake and contort like mad dogs before what must be an excruciating and inevitable death. In human beings, dementia and paralysis precede death. Scientists speculate that cattle contract the disease by feeding on sheep parts that are infected with another disease, a practice officially banned in England in 1989. The disease can take years to develop.

McDonald's and Burger King in England have stopped selling British meat.

Unidentified Woman #1: And it's certainly put me off hamburgers.

Unidentified Man #1: Won't be eating beef again.

WINFREY: (Voiceover) Europe has refused to import it.

Unidentified Man #1: That ban is not justified.

WINFREY: (Voiceover) And now Britain will destroy 4.7 million older cows that may have fed on sheep parts. The scare is turning a nation off beef eaters away from their favorite food.

Unidentified Woman #2: I don't eat beef at all. No way. Not after this, anyway.

WINFREY: (Voiceover) Could it happen here? American officials say no, but so did the British government until last month.

Unidentified Man #2: They basically covered up, having said that it was impossible to transmit to humans. It obviously was.

WINFREY: (Voiceover) Though the link between cattle and humans has not been definitively proven and there's no test for mad cow disease, the fear it has generated may destroy an industry and dramatically alter the way we eat.

*(End of excerpt)*

WINFREY: That is hard to watch. My first guest is speaking out in America for the first time today. She has left the bedside of her granddaughter in England for the first time in two and a half years to share with all of us her story. Beryl Rimmer believes that her 18 year old granddaughter, Vicki, is in a coma today because she ate hamburger tainted by mad cow. Beryl is outraged by what she believes was a British government cover up on the link between mad cow disease and Creutzfeldt-Jakob disease in humans.

So you believe the government has covered up?

Ms. RIMMER: I do. I believe they've covered it up since Vicki had it in 1993.

WINFREY: Mm-hmm. So...

Ms. RIMMER: Vicki was 15 years of age when she had it

WINFREY: Uh-huh. And what did she have? She did she began to— begin to get immediately sick after eating a hamburger, or...

Ms. RIMMER: No. She—she was full of life and she just started losing weight terribly. And just as you saw those animals falling about, that's how Vicki was. She was falling everywhere and unsteady and she had loss of memory and she couldn't see. And she went into hospital.

WINFREY: What did the doctors say was happening?

Ms. RIMMER: They said nothing. They said there's nothing wrong with her. And then I—I took her privately and he admitted her the next day and she never came home. She went into a coma in the second week.

WINFREY: So she's falling apart. She can't stand, she's going blind and they say there's nothing wrong with her?

Ms. RIMMER: That's what they said. And so I took her privately and she was admitted the next day. They did tests for two weeks.

WINFREY: Mm-hmm

Ms. RIMMER: And in the second week she went into a coma. First of all, they diagnosed it was a measles virus, which I come back and attack the brain.

WINFREY: Mm-hmm.

Ms. RIMMER: But then a lot...

WINFREY: Because that's what this disease does, it attacks the brain

Ms. RIMMER: Y—yes.

WINFREY: Yeah.

Ms. RIMMER: They said it was incurable

WINFREY: Mm-hmm.

Ms. RIMMER: But then, after a lumbar puncture, that proved them wrong. So they asked permission to do a brain biopsy while she was still alive.

WINFREY: Mm-hmm.

Ms. RIMMER: And they did this brain biopsy and it diagnosed a spongiform encephalopathy, which is the human form of BSE.

WINFREY: Mm-hmm. And so now that we're finding that other people have contracted the disease and nearly four million

Ms. RIMMER: Well, Vicki was the youngest

WINFREY: ...four million point 4.7 million cattle are going to have to be destroyed. How does that make you feel?

HAR 1643

Ms. RIMMER: What I'm saying is you should come with me every day and see Vicki in a coma. She's blind. She can't move. She can't see, she can't see. She can't swallow. It's just a living hell, seeing her every day.

WINFREY: Mm-hmm. So you see what the disease has done.

Ms. RIMMER: Yes.

WINFREY: My next guest's mother-in-law died from Creutzfeldt-Jakob in 1993. Linda Marler says she had no idea how her mother-in-law contracted the disease until mad cow made headlines. She then remembered her mother's visit to England, where she had eaten beef.

You believe your mother-in-law ate tainted beef?

Ms. LINDA MARLER (*Mother-In-Law Died From Creutzfeldt-Jakob Disease*): Well, I believe now, since what we've been hearing, that it's certainly a distinct possibility that this is how she got the disease.

WINFREY: Because what were her symptoms in the beginning?

Ms. MARLER: It sounds very much like these symptoms that Vicki had.

WINFREY: Mm-hmm.

Ms. MARLER: She would wake up in the morning and she would be very weak. She would feel so tired that she couldn't hardly walk. She would have to get help walking. And later in the day she would kind of bounce back. This was the very beginning. This is how it started. And it progressed very rapidly after that.

WINFREY: Whoa. Did you immediately then think, 'Oh, this - this is what happened to my mother-in-law'?

Ms. MARLER: Immediately. I said to my husband, 'Did you hear what's on the radio?

WINFREY: Mm-hmm.

Ms. MARLER: I said, 'This is what she had'. And I - I knew they had been overseas several times. And so I talked to my father-in-law, and he said, '1986 was when we were in London and, yes, she did eat beef there.'

WINFREY: Whoa. Next, can it happen here? It's the question we all want to know. Many government official--officers say no way. But when we return, we'll meet a man who believes a mad cow scare in the United States will be more devastating to us than AIDS has been. We'll be right back.

(Announcements)

WINFREY: Well, many are concerned about the situation in Britain The question they want to know is, can it happen here? Dr. Gary Weber is with the National Cattleman's Beef Association. He says out

government regulations have seen to it that our beef supply is safe. My next guest disagrees. He believes that the United States will face a similar crisis within the next 10 years. Have mercy. Howard Lyman is a former cattle rancher-turned vegetarian - You hear me?- former cattle--cattle rancher-turned vegetarian -- we want to know why -- and executive director of the Humane Society's Eating With Conscience campaign.

You said this disease could make AIDS look like the common cold?

Mr. LYMAN: Absolutely.

WINFREY: That's an extreme statement, you know.

Mr. LYMAN: Absolutely. And what we're looking at - at right now is we're following exactly the same path that they followed in England 10 years of dealing with it in its public relations rather than doing something substantial about it. One hundred thousand cows per year in the United States are fine at night, dead in the morning. The majority of those cows are rounded up, ground up, fed back to other cows. If only one of them has mad cow disease, has the potential to infect thousands. Remember, today, the United States 14 percent of all cows by volume are ground up, turned into feed and fed back to other animals.

WINFREY: But cows are herbivores. They shouldn't be eating other cows.

Mr. LYMAN: That's exactly right. And what we should be doing is exactly what nature says: We should have them eating grass, not other cows. We've not only turned them into carnivores, we've turned them into cannibals.

WINFREY: Now see? Let - wait a minute. Wait a minute. Let me just ask you this right now, Howard. How do you know for sure that the cows are ground up and fed back to the other cows?

Mr. LYMAN: Oh, I've seen it. These are USDA statistics, they're not something that we're making up. Right now, remember

WINFREY: Now doesn't that concern you all a little bit right here, hearing that? It has just stopped me cold from eating another burger. I'm stopped. But Dr. Gary Weber says we don't have a reason to be concerned. But that in itself is disturbing to me. Cows should not be eating other cows.

Dr. WEBER: Well, let me clarify that. There is a reason to be concerned. We've learned from the tragedy in Great Britain and make a decision here, both government

WINFREY: What we learned in the past two weeks.'

HAR 1644

Dr. WEBER: No no We started taking initiatives 10 years ago to make sure this never happened here

WINFREY: OK

Dr. WEBER: Let me go back and correct a couple things

WINFREY: OK.

Dr. WEBER: Number one: We do not have BSE in this country and we have a 10 year history of surveillance to document that Based on science, we do not have it. Also, we have not imported any beef in this country since 1985 from Great Britain.

WINFREY: Are we feeding cattle to the cattle?

Dr. WEBER: There is a limited amount of that done in the United States. These are very—hang on just a second. Well...

WINFREY: Mm-hmm.

Dr. WEBER: The—the Food and Drug Administration...

WINFREY: Because I have to just tell you ..

Dr. WEBER: Sure.

WINFREY: That is alarming to me.

Dr. WEBER: Yeah.

WINFREY: That is alarming to me.

Dr. WEBER: Now keep in mind, before you you view the ruminant animal, the cow, as simply a vegetarian remember that they drink milk

WINFREY: So you're saying this could never happen here?

Dr. WEBER: No. We're doing everything we need to do.

WINFREY: I know. But, Dr. Weber, are you saying that we—that we have been watching this for 10 years—are you saying every cow that's ever died, they've examined w—the reason why that cow died before they ground that cow up and fed him to another cow?

Dr. WEBER: No, that's not what I'm saying.

WINFREY: OK.

Dr. WEBER: I'm saying that we do not have the disease here. We've got 10 years of data, the best scientists in the world who are looking for this over 250 trained technicians and veterinarians around the country. Everyone's watching for this. Everyone would like to, in - in a way want to find this if it was there because they want to protect our industry and, of course, the public.

WINFREY: OK. Let's meet this man Dr. Will Hueston is with the United States Department of Agriculture

Dr Hueston, you think mad cow's a threat to US cattle?

Dr. WILLIAM HUESTON (US Department of Agriculture): I think it's an issue that we need to be on top of at all times, but there's no evidence at all that we have this bovine spongiform encephalopathy in the United States.

WINFREY: What'd you just say?

Dr. HUESTON: What I've yes, I've given you a mouthful

WINFREY: Uh huh.

Dr. HUESTON: but I think it's important Oprah, and especially—and I appreciate you having this show to help clarify some of these issues...

WINFREY: Yeah. Me, too.

Dr. HUESTON: ...that the term 'mad cow'

WINFREY: Mm hmm.

Dr. HUESTON: ...stimulates a whole lot of feelings and concerns in people. And remember that cows can get mad for a lot of reasons This is a disease, a specific disease in Great Britain, a tragic disease of cattle, called bovine spongiform encephalopathy, and they use the initials BSE.

WINFREY: OK. BSI...

Dr. HUESTON: Yes.

WINFREY: OK. I want to know why Howard, who used to be a cattle rancher, is now—was a cattle rancher You were?

Mr. LYMAN: Yes.

WINFREY: ...why you are now a vegetarian What made you turn'

Mr. LYMAN: Well, what—what I know about what is happening out there with cattle, like feeding cows to cows, I look at it and say that that's a risk that I'm unwilling to take. The same things that we've heard here today is exactly what was heard for 10 years in England 'Not to worry, we're on top of this.' You know, we've had a ban in the United States of feeding sheep to cows for a long time, but when they went out and looked, 25 percent of the renderers admitted that they were paying no attention to it. Voluntary bans do not work And if we continue to do what we're doing—feeding animals to animals— I believe we're going to be in exactly the same place, because I've heard all of these things before in England. We're on top of this It's safe We would not put the public at risk. They have put the public at risk

WINFREY: Yeah, of course they said that Yeah Even g th Weber, you know that, of course, they said that

Dr. WEBER: Keep keep in mind

WINFREY: because what else are they going to say'

Dr. WEBER: Keep ...

WINFREY: What else are they going to say' Are they going to say 'Public, you are at risk Some of you may die and the the cows are going to go crazy'' They couldn't have said that

HAR 1645

Mr. WEBER: Let me - let me - let me reiterate. We have

Mr. LYMAN: Ask yourself the question - Today, we could do exactly what the English did and cease feeding cows to cows. Why in the world are we not doing that?

WINFREY: Yeah.

Mr. LYMAN: Why are we skating around this and continuing to do it when everybody sitting here knows that that would be the the safest thing to do? Why is it? Why is it? Because we have the greedy that are getting the ear of government instead of the needy, and that's exactly why we're doing it.

WINFREY: Well—also another beef risk which will kill 500 and poison 20,000 Americans this year. We'll talk about that when we come back. Mm-hmm.

(Announcements)

WINFREY: We have a lot of questions about this mad cow disease that we'd like to try to get resolved, because we don't want to just -to alarm you all. But I have to tell you, I'm thinking about the cattle being fed to the cattle and that's pretty upsetting to me. Yes, ma'am.

Unidentified Woman #3: I just had one question. I'm confused about why cattle are being fed lamb and why are they be—being fed beef.

Mr. LYMAN: Well, what it comes down to is about half the slaughter of of animals is non-salable in humans. They either have to pay to put it into the dump or they sell it for feed, they grind it up, turn it into something that looks like brown sugar, add to it all of the animals that died unexpectedly, all of the road kills and the euthanized animals— add it to them, grind it up and feed it back to other animals. It's about as simple as you can be. We are doing something to an animal that was never intended to be done.

WINFREY: OK. So the point I wanted to ask Dr. Weber - and I think I asked this earlier, but let's get this clear—oh, that's your point, isn't it? You—during the commercial break? Oh, lady in black. What was your question? You can ask it.

Unidentified Woman #4: My question was, are the animals tested before they're ground—all the animals that are ground up into feed that are fed to the cows?

Dr. WEBER: There is no test...

WINFREY: OK.

Dr. WEBER: ...other than analyzing the brains. And since we don't have animals with these symptoms - not every brain is going to be evaluated.

WINFREY: OK. So the answer to your question, ma'am, is no

Dr. WEBER: Is no. That's correct

-8-

WINFREY: OK.

Dr. WEBER: No animal can enter the plant that has any of these symptoms, by law. And there's veterinarians and anti-mortem inspection. It doesn't happen, Howard, and you know it

Mr. LYMAN: Oh, come on

Dr. WEBER: It doesn't happen.

Mr. LYMAN: Let's get real. Any animal that is not staggering around...

Dr. WEBER: No.

Mr. LYMAN: ...goes in there. You know as well as I do. We have 100,000 cows...

Dr. WEBER: No. Howard...

Mr. LYMAN: ...per year that have - that die. They take 2,700 brains...

Dr. WEBER: No.

Mr. LYMAN: ...out. Of those, less than 100 of them, they look for prions. They were looking for spongiform.

Dr. WEBER: No. No.

Mr. LYMAN: We ended up feeding downed cows to mink; the mink came down with the disease, transfer it to animals. The animals came down with it. And you're sitting here, telling everybody that it's safe. Not true.

Dr. WEBER: No, Howard. Howard, you know, I - I understand

WINFREY: OK. Next, there are many concerns about American beef

One of them is E. coli, which we'll discuss when we come back.

(Announcements)

WINFREY: Right here in the United States, a Jack in the Box E. coli scare happened a few years ago, but it was a major wake up call to the entire country about the dangers of eating beef that is not fully cooked. These are the states that had an outbreak of E. coli last year. The Center for Disease Control estimates that 20,000 people will get sick from E. coli; 500 will die this year. Now, see, those are just numbers you hear. I know how it is. Because you watch the news every night and you hear 'This many people dead, this many' but think of that - in the 500 is somebody who is a member of your family, and it won't just be a number to you. This was Michael and Diana Nole's story in 1991

(Excerpt from video)

Ms. NOLE: Mike left to go get something to eat and he came home with Jack-in-the Box. And I said 'Well I'm not hungry.' Let Michael eat his cheeseburger and we'll get out of here.'

Mr. NOLE: That cheeseburger I got Jack in the Box that day... before was so raw in the middle that I tore the edges off the hamburger

HAR 1646

to feed my son because it looked cooked. The rudest thing about it is that he didn't want to eat

Ms. NOLE: We rushed him because we were trying to get ...

Mr. NOLE: And I picked up those three or four pieces and put them in his mouth. And he ate it.

Ms. NOLE: I remember that. I forgot about that, honey. I really did

Mr. NOLE: And it—it's like I've got to live the rest of my life because of some stupid guy—or some stupid system, put it that way killed.

(End of excerpt)

WINFREY: Whoo. Michael Jr. was two and a half when he died of E. coli poisoning. Since then, Jack-in-the-Box has taken measures to ensure safer hamburgers by cooking all beef at 155 degrees. I understand, Michael, you couldn't bring yourself to watch that video before today because you're still blaming yourself

Mr. NOLE: It's --yeah, it's hard. It's very hard. If the main reason for me coming today is to give other parents the chance that I didn't have as far as knowing that-- that meat, being raw in the middle-- throwing it away would have saved my son's life.

WINFREY: Mm-hmm.

Mr. NOLE: And I just...

WINFREY: So you realized it wasn't cooked in the middle

Mr. NOLE: Mm-hmm.

WINFREY: So you didn't feed him that part.

Mr. NOLE: No.

WINFREY: It was just the -- so that's why; you took it from around the edges, and you thought that was cooked...

Mr. NOLE: Surely.

WINFREY: ...but, obviously, it wasn't as cooked as you thought?

Mr. NOLE: Mm-hmm. It was...

Ms. NOLE: It—it...

WINFREY: Was contaminated.

Ms. NOLE: It's contaminated. Cross-contamination kills just as easily as consuming the product itself

WINFREY: Mm-hmm.

Ms. NOLE: It's devastating. It should never happen, and it happens all the time. It's here in the United States. Unlike they say, this - This problem's not here'--it's coming. It's going to happen. This is killing our children-- 200, 300 a year-- and it-- and there's nothing we can do about it.

WINFREY: E. coli.

Ms. NOLE: E. coli.

-10-

WINFREY: Mm-hmm.

Ms. NOLE: Our current meat inspection system is inadequate. They're still basing it on sight tests and smell.

WINFREY: In spite of everything you heard here today from Drs. Weber and Hueston, you don't-- you don't ...

Mr. NOLE: Nor-- I don't-- I don't have any faith.

Ms. NOLE: I don't buy that for a minute.

Mr. NOLE: ... in anybody in the USDA. But I'll tell you what: I'll never eat ground beef again, ever.

WINFREY: Mm-hmm.

Ms. NOLE: And I'll never feed my child meat until he's old enough to understand what happened to his older brother and ...

Mr. NOLE: Yeah.

Ms. NOLE: ...to-- to understand what would happen if you did eat it-- what could happen. There-- I don't believe for a minute that anyone in the United States cannot be sick from - from what we've been talking about. I don't believe for a minute that it cannot happen, because it can. It's proven. It will happen. And it'll happen again.

WINFREY: OK. Kathy ordered a salad at a popular restaurant in Boise, Idaho, and was horrified to find that there was E. coli on the lettuce.

  What happened to you, Kathy?

Ms. KATHY AITCHISON (Caught E. Coli Poisoning From Lettuce In Caesar Salad): I went into lunch with my dad and sister on my birthday. And everything appeared fine. There was nothing - nothing noticeably wrong with it. And I had a Caesar salad. I just ate it, and left line. The next—a couple days later, I got what we thought were flu symptoms. And a few days later I - I was discharging blood. And that's when I pretty much knew there was something wrong. We went to the hospital and later found out it was E. coli.

WINFREY: Mm-hmm. So you were older, so your body could handle it.

Ms. AITCHISON: Right.

WINFREY: Is that what that doctor said? Kt-- young kids get it -it just takes them right out.

Ms. NOLE: Not necessarily the age so much

WINFREY: Mm-hmm. Mm-hmm

Ms. NOLE: ...as it is the immune level in the child

WINFREY: Mm-hmm.

Mr. NOLE: Well, it's mainly younger kids and older - older people

WINFREY: Yeah, because your immune system

Mr. NOLE: people over 60

11

HAR 1647

WINFREY: Mm hmm

Ms. AITCHISON: I've always been very healthy, so, for me, it knocked me out for pretty close to a month

WINFREY: Whoa

Ms. AITCHISON: ...before I went back to work. I dropped out of school for the semester. But with me, I mean, I've always been healthy. So it didn't—but that's what they said, younger kids and and older people

WINFREY: Well, is raw ground beef that turns brown after a day or two in the refrigerator safe to eat? Find out in our food safety quiz when we return. We'll be right back.

(Announcements)

WINFREY: We have some questions about E. coli. I'm sure a lot of you do, too. Connie Diekman is with the American Dietetic Association. And I don't know; I was thinking this: If you can get it from the Caesar salad and Michael Jr. died from a hamburger—I don't know about y--I'm--I'm confused. How could that be, Connie?

Ms. DIEKMAN: Well, E. coli is a bacteria, and bacteria can be anywhere. It can be on your hands, it can be on your kitchen counter, it can be in the food.

WINFREY: How'd it get to her Caesar salad? We don't know?

Ms. DIEKMAN: It could be in the preparation. It could have been a part of the ingredient in it. Keys here as we talk in terms of food as we eat it, is; How safely was that food prepared and how thoroughly was it cooked?

WINFREY: Uh huh. Because you can kill E. coli with heat.

Ms. DIEKMAN: If--if something is heated above 140 minimum—ideally you want to take it up to about 160, 165—that will kill the bacteria, and then our bodies can tolerate it. The problem is if you don't cook it completely, so never eat raw hamburger. Never.

WINFREY: OK. Then what's steak tartare?

Ms. DIEKMAN: Exactly.

WINFREY: Oh.

Ms. DIEKMAN: Exactly.

WINFREY: So you shouldn't be eating steak tartare, ever?

Ms. DIEKMAN: Raw ha - raw meat, you're running a risk.

WINFREY: Even Dr. Weber says you shouldn't be eating steak tartare.

Dr. WEBER: I cook everything

WINFREY: OK

Dr. WEBER: I don't eat anything raw.

Ms. DIEKMAN: Juices should always run clear. If juices run pink you're asking for trouble in terms of bacteria still in that meat

WINFREY: Even in a steak?

Ms. DIEKMAN: Yeah. Yeah, even in a steak

WINFREY: So when it's medium...

Ms. DIEKMAN: Whether it's beef, pork, veal, chicken...

WINFREY: Get out of town.

Ms. DIEKMAN: Animals - we're an animal. We have bacteria. I mean, where—where do your hands go throughout the course of the day? There is bacteria everywhere. And the same applies to the animal. So when you fix that meat, if you take your - your hands, which have been...

WINFREY: Everywhere.

Ms. DIEKMAN: ...and you're fixing that hamburger, you're cross-contaminating the meat in addition to the bacteria that's in the meat. If you then don't cook it completely.

WINFREY: Let's go back to the pink part. So if you're getting a steak, like, medium --don't you get yours medium, where it's a little pink inside? And it does...

Ms. DIEKMAN: Medium...

WINFREY: Oh, I know you all do it well done, girls. But I know it's a cultural thing. Wait a minute. I go out with my black friends. They say, 'Well, well, well done.' Yeah. Uh huh. The steak comes back singed. OK. So you should not be getting it medium rare or

Ms. DIEKMAN: Medium would be your best choice

WINFREY: OK.

Ms. DIEKMAN: Medium rare, you're - you're asking for some risk

WINFREY: Whoo!

Ms. DIEKMAN: And, obviously, what we also want to remember is that there's many other factors involved here. Just just because a piece of meat may be a little bit pink doesn't mean you should throw it away. But what you want to keep in mind is that the animal has bacteria in it naturally, and if it it is very rare, pink, juices running red, you want to send it back

WINFREY: Oh, my goodness.

Dr. WEBER: Oprah

WINFREY: Well, I have to - yes

Ms. DIEKMAN: Again, if you do not wash your hands after you've used restroom facilities, if you do not wash your hands bef - after you come home from work and throw dinner on the table, you are cross-contaminating, whether that food is cooked completely or not

HAR 1648

WINFREY: Wow, Nancy at the microphone has something to say Nancy, you lost a child

NANCY: My six-year-old son, Alex, died six months after the Jack-in-the Box outbreak from eating hamburger. One thing I'd like to make a point that is...

WINFREY: Now at Jack-in-the-Box?

NANCY: Now at Ja—here in—here—right here in Chicago, and it was from store-bought ground meat. We have to remember here, we are talking about fecal contamination, and we shouldn't be eating fecal-contaminated food, fully cooked or not.

Ms. NOLE: That's right.

NANCY: And it is not up to the consumer—it should not be up to the consumer or somebody flipping burgers in restaurants to make s—to—to have to be dealing with that type of—of danger. We need to be keeping the contamination out of the meat, out of the product, before it ever hits our grocery stores and our restaurants.

I want to clear up one other point. E. coli—and this is a particular strain of it—is not at all natural in human beings. We all have E. coli. This particular strain is only in cattle fecal matter—0157. The only way it can infect and contaminate meat is through sloppy slaughtering or through inand—and because of inadequate inspection methods that we have now.

WINFREY: OK. Thank you very much, Nancy. OK, everybody, listen up. This is really, really important. Connie has put together a little food safety test with questions that we should all know the answers to. See how much you do know when we come back. It could save you or somebody in your family. Back in a moment.

(Announcements)

WINFREY: Quick point you wanted to make was?

Ms. NOLE: With the summer coming around the corner, a lot of people barbecuing, cross-contamination, safe food handling—when you're barbecuing any type of meat, you bring it out on the plate, you barbecue it, they're done. You pick it up; put it on a clean plate. Don't use the same spatula to turn the raw meat that you use to pick up the done meat, because what have you done? You've cross-contaminated

WINFREY: Oh, good point. OK. See if you know the answers to these questions about your own food. Let's go down the list. Number one: Garlic in olive oil—safe or risky?

Ms. DIEKMAN: Risky if you're making it yourself. You're cross-contaminating again. You're putting garlic in that is a plant, has bacteria on it, into olive oil. If it let—if you let it sit, you're letting

bacteria grow. Buy it already made that way or make fresh batches every single time.

WINFREY: Whoa. Number two, an uncooked potato with a greenish cast—safe or risky?

Ms. DIEKMAN: The—the greenish cast indicates a chemical is present. It can give you some stomach upset. So it's a good idea to peel it, get rid of the green and then go ahead and use it.

WINFREY: A bruised piece of fruit safe or risky?

Ms. DIEKMAN: Bruised is safe, moldy is risky. If there's mold on fruit, cut it away. If it's a little bitty—you know, like a grape or a berry, throw it away. If in doubt, throw it out

WINFREY: OK. What about mold on bread?

Ms. DIEKMAN: Mold on bread- it can be risky because, again, mold grows in. If it's hard bread it's easier to trim. If it's soft, y again, your safest bet is to throw it out

WINFREY: So trimming eliminates it, or it hasn't gone penetrated through the rest of the...

Ms. DIEKMAN: That's a question mark. If it's a hard bread and it's on the surface, you can probably trim most of it. Soft bread my recommendation is, don't take a chance

WINFREY: Number four. One-week old hard boiled eggs in the refrigerator—safe or risky? Everybody got that - I still have my Easter eggs in the refrigerator

Ms. DIEKMAN: That's right. That's right Hopefully they're in the refrigerator.

WINFREY: Yeah

Ms. DIEKMAN: That's number one. Hard boiled eggs must be in a refrigerator, where the temperature's less than 40 degrees, and one week maximum, because bacteria in a refrigerator does not die It is still there and it can continue to grow. So hard boiled eggs, after one week, get rid of them. Raw eggs keep longer.

WINFREY: How long can you keep a raw egg?

Ms. DIEKMAN: You can keep it almost a month, because you're going to cook it.

WINFREY: I think I've—have raw eggs that have been in the refrigerator for years.

Ms. DIEKMAN: Well, it - we might be snticking it there

WINFREY: For years the sa because we never eat eggs And it's the same carton of eggs there

Ms. DIEKMAN: That that comes to this proper shopping

WINFREY: Uh huh

Ms. DIEKMAN: Buy what you're going to use, so that you then let--get--use it before it goes bad.

WINFREY: Oh, thank you so much, Connie.

Ms. DIEKMAN: You're welcome.

WINFREY: OK. Cooking stuffing in your turkey- safe or risky.

Ms. DIEKMAN: If do you it correctly, it's safe. Most people do it incorrectly. Number one: Wash the inside of the bird --water, not soap. Don't put soap in there. You'd be amazed at the people who will. Number two: Stuff right before you're going to put it in the oven. Number three: Stick a thermometer in there and make sure the in--the temperature of the stuffing reaches above that minimum 140 degrees. And then, finally, when you take the bird out, take the stuffing out, put it in a separate pan. Keep it cool or hot until you're ready to serve it. And make sure it gets refrigerated afterwards.

WINFREY: Thawing frozen food on your kitchen counter at room temperature. Everybody does this. Is that safe or risky?

Ms. DIEKMAN: That's what I was sort of afraid of It is very risky, very risky.

WINFREY: Don't you-all all do that?

Audience: Yeah.

Ms. DIEKMAN: Room temperature...

WINFREY: OK Let's go over that again. Thawing frozen food on your kitchen counter—I know right now you-all got some chicken setting out there. Watch it right now. It's thawing right there on the kitchen counter. And that is risky?

Ms. DIEKMAN: Risky. Bacteria grows....

WINFREY: I've done this 100,000 times.

Ms. DIEKMAN: And—and people say, 'I've always done it. What's the big deal?

WINFREY: Yeah.

Ms. DIEKMAN: Well, you've been lucky, number one. And—or number two, remember that little stomach upset you had that you thought was the flu? Guess what? Wasn't the flu It was called food bacteria -food-borne illness. Key is, between 40 degrees and 140 is where bacteria grows—room temperature.

WINFREY: Oh.

Ms. DIEKMAN: Do not defrost at room temperature. That's what planning ahead is for. But that's what the microwave is for

WINFREY: Oh. So you can do it in the microwave?

Ms. DIEKMAN: Sure, because you're doing it quickly You're not letting it sit out there. I mean, how long does it take for that chicken to defrost?

WINFREY: Oh, several hours.

Ms. DIEKMAN: Two hour—anything out of the refrigerator or anything out of hot temperature for longer than two hours, bacteria grows.

WINFREY: Oh, Connie, that is a good tip-la. Very good

Ms. DIEKMAN: Thank you.

WINFREY: When you cut a package after the 'sell by' date safe or risky?

Ms. DIEKMAN: 'Sell by' means when the grocer must pull it from their shelf, so that if you buy it and the 'sell by' da—date is today, you can still use that for another week—up to a week. It's still good. 'Use by' means you must use it by that date

WINFREY: OK An u—an opened jar of mayonnaise that has been in the refrigerator for six months?

Ms. DIEKMAN: Now, see, here you're OK Mayonnaise in the refrigerator is very safe. Mayonnaise has vinegar in it, which is an acid and which will prevent bacteria from growing.

WINFREY: Open, meaning the top is on it but it's been opened It's been unscrewed

Ms. DIEKMAN: Right. You've been u - you've used it

WINFREY: OK.

Ms. DIEKMAN: Now that's assuming you haven't cross-contaminated it.

WINFREY: It's not just sitting there all out in the open there—yeah—all crossed over and stuff.

Ms. DIEKMAN: And we're assuming you didn't cross-contaminate in the beginning. You know, in other words....

WINFREY: We're assuming you didn't cross-contaminate

Ms. DIEKMAN: ...you didn't put your fingers in to get mayonnaise I don't think most people do that.

WINFREY: OK. This is a question that's not on our thing here, but—but—OK. Everybody—picnics and potato salad in the summertime How long can you have potato salad out?

Ms. DIEKMAN: Potato salad is where you get bac- if it if it has the eggs in it, or if you have tuna salad, chicken salad ..

WINFREY: Right.

Ms. DIEKMAN: ...where you get in trouble trouble is that protein food. That's what promotes bacterial growth No.

WINFREY: It's not just the mayonnaise by itself?

Ms. DIEKMAN: It's not the mayonnaise at all The mayonnaise inhibits, because it has the acid in it the vinegar So the the vinegar stops the bacteria from growing It's when you put it with these other

HAR 1650

foods that are bacteria growers. So that when you have something that has protein in it...

WINFREY: Eggs. Eggs.

Ms. DIEKMAN: ...the tuna, chicken, eggs, whatever-- you're looking at -- keep it cold, less than 40 degrees.

WINFREY: Uh-huh.

Ms. DIEKMAN: So if you're taking it to a picnic, put it in a cooler with ice, covered.

WINFREY: I'm s--but s—my question is, how long can that sit out?

Ms. DIEKMAN: No longer than two hours.

WINFREY: No longer than two hours.

Ms. DIEKMAN: No longer than, so that doesn't necessarily mean at two hours you're safe. Best thing, again, is err on the side of safety, so less is better.

WINFREY: OK. Steak that was thawed in the refrigerator and then refrozen—safe or risky?

Ms. DIEKMAN: It is safe if ice crystals are still in the meat...

WINFREY: Uh-huh.

Ms. DIEKMAN: ...and it's been te—in the refrigerator less than a day. Either of those two things are not there, it's risky because, again, bacteria will start to grow.

WINFREY: Now--because if you thawed it at room temperature, you're already – it's...

Ms. DIEKMAN: You're out of—right.

WINFREY: Right.

Ms. DIEKMAN: Right. But if it's been in the refrigerator –so, say, this morning you put it in there because tonight that's what you're going to have.

WINFREY: Right.

Ms. DIEKMAN: Tonight you get home and you decide 'No, I don't want to have that.'

WINFREY: Right.

Ms. DIEKMAN: 'I'll stick it back in the freezer.'

WINFREY: Right.

Ms. DIEKMAN: You're going to be OK, if there's still ice crystals...

WINFREY: If there's still ice crystals.

Ms. DIEKMAN: Right. You may lose a little of the flavor, because it gets a little watery.

WINFREY: Ice crystals means it's still frozen inside.

Ms. DIEKMAN: It's still frozen.

WINFREY: OK.

Ms. DIEKMAN: And lunch it. It it's soft, it's not still frozen. And then cook it, and then refreeze it.

WINFREY: OK. Eating raw cookie dough –safe or risky?

Ms. DIEKMAN: I hate to say this, but it is risky.

WINFREY: You cookie dough eaters over there.

Ms. DIEKMAN: I know. I'm a-- I'm-- I'm a poor sport here.

WINFREY: You've eaten bowls of it in a lifetime.

Ms. DIEKMAN: It has raw eggs in it.

WINFREY: Oh, and this is ...(unintelligible).

Ms. DIEKMAN: Cookie dough has raw eggs in it, and raw eggs are a wonderful source of bacteria, whether the shell is cracked or not. Chickens are not the cleanest animals around.

WINFREY: They are filthy little birds, aren't they?

Ms. DIEKMAN: Yeah, they are.

WINFREY: Next, our camera followed a health inspector along on surprise visits to restaurants, and the results are pretty unappetizing. Back in a moment.

Mr. PHIL KING (Health Inspector): What's in this box? Why do you have the dishes in here, and why do you store dishes in here?

(Announcements)

WINFREY: This isn't the type of thing you want to think about as you're sitting down before a plate of meat loaf. But have you ever wondered if the restaurant kitchen is clean? For my next guest, surprise restaurant inspections are all in a day's work. Phil King is a health inspector for the city of Chicago, and in just a moment you're going to see the dirty truth on why one restaurant received a failing grade. But first, here's what Phil looks for on a routine visit.

(Excerpt from video)

Mr. KING: Over the years I have inspected 5,000 restaurants and I've closed maybe 100.

We're here to do your routine inspection.

Unidentified Man #3: Sure.

Mr. KING: OK?

The most important focus for us is how is the food received in delivery, stored, prepared, and served to the customer?

This is the waste line?

Man #3: Uh-huh.

Mr. KING: And you can't prep or store food up under the waste line. You've got to move the table.

Sometimes you see evidence of roaches around damp warm places like compressors. One of my pet peeves is the bathroom. Very good. Very good. Flushes. And it works. We consider cold foods to be...

HAR 1651

stored at 40 degrees or less and hot foods to be stored at 140 degrees or higher. This prohibits or at least retards the growth of bacteria.
(End of excerpt)

**WINFREY:** And now, here's the inspection of a place you will not be dining in anytime soon, thanks to Phil. Take a look.
(Excerpt from video)

**Mr. KING:** We closed this restaurant a couple of weeks ago for some sanitation violations. They had a rodent problem, a roach problem and a garbage problem. We're back today to see if they are now in compliance to a degree which would allow us to reopen them.
Let's get rid of the—the open food. Throw this stuff away, man, OK?
What's in this box? This is chopped meat in here? Throw this stuff away.

**Unidentified Man #4:** ...(Unintelligible).

**Mr. KING:** Throw this away. Throw the open food away. Clean the shelves off. Clean the top of the equipment off. How do you get to the basement?
Oh, my God. The basement is a disaster. The toilet is flushing into the basement. There is sewage water all over the basement. It looks to be two to three feet of sewage water in the pit where the old furnace was at. I don't need to see no more.
(End of excerpt)

**WINFREY:** What did that smell like, too, Phil? How typical is that type of dirty kitchen, though?

**Mr. KING:** Not very typical.

**WINFREY:** That's not very typical.

**Mr. KING:** No.

**WINFREY:** That was over and beyond. That's just—the people didn't even want to be in business. Did they say, 'Thank you so much for chasing us down'? They say, 'We didn't want to work no way. We just—yeah.

**Mr. KING:** No. That was an unusual cir—circumstance.

**WINFREY:** Uh-huh.

**Mr. KING:** You may see that once or twice in a 10-year—in a career.

**WINFREY:** Really

**Mr. KING:** I mean, you just don't see that that often

**WINFREY:** That bad.

**Mr. KING:** That bad.

**WINFREY:** Now is it—do you come close to that? Or what is usually the violations that people have made?

-20-

**Mr. KING:** Normally the violations are more in terms of food handling practices...

**WINFREY:** Mm-hmm.

**Mr. KING:** ...as opposed to structural practices.

**WINFREY:** Mm-hmm. Mm-hmm.

**Mr. KING:** But it depends on the area you're working in. I mean, if you're working in an affluent area, you'd see less structural problems. If you're working in a less affluent area, you'd see more structural problems.

**WINFREY:** Less affluent areas take more risks?

**Mr. KING:** No, it's—don't have the resources to put new walls up...

**WINFREY:** Mm-hmm.

**Mr. KING:** ...put new ceilings up.

**WINFREY:** Well, Ken Pannarella has spent the last 21 years as the chief sanitarian for the Chicago Health Department, which monitors food safety in restaurants. Same thing—you think that's abnormal what we saw there? Mm-hmm.

**Mr. KEN PANNARELLA (Chief Sanitarian, Chicago Health Department):** Yes. There are over 9,000 eateries in the city of Chicago. We have to suspend licenses in probably 125, 130 per year.

**WINFREY:** Would we know if you'd suspended a license in a restaurant, for example?

**Mr. PANNARELLA:** Yes.

**WINFREY:** If you—would we have known that, if you'd gone in and gav—given somebody—because what do you get, A, B, C, D, like grades in school?

**Mr. PANNARELLA:** No, we don't do that in Chicago

**WINFREY:** OK.

**Mr. PANNARELLA:** They do that in other areas but not in Chicago

**WINFREY:** OK. So would we have known if a restaurant had gotten a low grade? Because they don't—that's not one of the things they put up in the window.

**Mr. PANNARELLA:** You would have known, because Phil would have pasted that bright orange—bright green sign that you saw in your display. But if you hadn't seen that...

**WINFREY:** That's if the license is suspended, though, it says

**Mr. PANNARELLA:** Right

**WINFREY:** So—but would you know, for instance, if you were in a restaurant the question I'm trying to get to, if it got a low grade not enough to be closed down but just that things weren't what they should have been.

**Mr. PANNARELLA:** Minimally acceptable

-21-

HAR 1652

WINFREY: Yeah

Mr. FANNARALLA: You would—you would not have known that

WINFREY: I would not have known.

Mr. FANNARALLA: No.

Mr. KING: But you could have.

WINFREY: How could I have?

Mr. KING: Because we do an inspection report that requires the owner to place it in a conspicuous location.

WINFREY: Uh-huh.

Mr. KING: So you have a right as a consumer to ask to see the report if you choose to.

WINFREY: Oh, OK. That's just something I never asked for in all these years. 'Could I see your report, please?' OK. Next, a warning about more dangerous foods and drinking water when we return. Back in a moment.

(Announcements)

WINFREY: We have a couple of more warnings about things you may or not be inclined to eat.

Vicki, I understand your father died after eating raw oysters.

VICKI: Yes. I took him out to dinner one Friday night. The weekend was unremarkable. By Monday he thought he had the flu. Even in talking to him...

WINFREY: Wow.

VICKI: ...he thought he had the flu. By one—by midnight he was almost dead—on Monday night; by 1 AM he was dead. And unlike the bar—the beef we have talked about that comes from maybe unsafe handling, these little oysters come up from the water already having the bad bugs. It's already there. And it's—it's called Vibrio vulnificus and the poison can eat you up, much worse than all that flesh-eating bacteria you heard about a couple years ago.

WINFREY: Mm.

VICKI: But if you do eat them cooked, be saf—try and be safe also, because 200 people got sick from what they were safe cooked oysters just over the past year—the largest multistate outbreak. These little slimy mollusks have a lot of bad bugs. If you're going to eat them, do them with thorough cooking. If you're going to eat them, know that you can get very ill. If you see a warning, heed it and please, please, please.

WINFREY: And lots of people eat raw oy— oysters.

VICKI: Oh, you...

WINFREY: ...C'mone, don't they?

Ms. DIEKMAN: Yeah. It's a very popular thing. But again you're talking about how it was handled in terms of once it's caught, how it was handled in the restaurant. Anything that's in that air to eat, you put yourself up at risk.

WINFREY: Also, she was saying, they come up out of—they come up out of the sea like that.

Ms. DIEKMAN: They come up naturally. Right

WINFREY: Yeah.

Ms. DIEKMAN: And—and that's why, again, if—if it's not properly cooked or properly heated, and maintained at that temperature, you're running a risk.

WINFREY: Mm. So you lost your father?

VICKI: Yeah.

WINFREY: Because of it.

VICKI: Yeah.

WINFREY: This is Christopher Grell. And I understand you think that your wife died from drinking herbal tea?

Mr. CHRISTOPHER GRELL (*Wife Died After Drinking Diet Herbal Tea*): Yes. Back in 1991...

WINFREY: I know you-all are like me. Now you think, Now we can't drink herbal tea neither?

Mr. GRELL: No, this was a different type of an herbal—it was an herbal diet tea.

WINFREY: Oh, OK.

Mr. GRELL: And the ingredients in it, unbeknownst to me at the time, contained combinations of laxatives and diuretics

WINFREY: Oh.

Mr. GRELL: And so it's not your Lipton tea or regular type of tea. It's a special type of tea that...

WINFREY: Diet tea.

Mr. GRELL: And it has the typical catchy name. There are now some requirements that notices be put on some of these products

WINFREY: And what was it, specifically, in there that you believe took her life?

Mr. GRELL: It was a combination of herbs, the most prevalent one being a—senna, as—an all natural herb. It's the same kind of ingredient that you'll find in some over-the-counter laxatives, in which people are told that they shouldn't use the product for more than a week...

WINFREY: Oh

Mr. GRELL: ...and they shouldn't use it at more than a certain dose. This particular company's product had advocated the use of the product

HAR 1653

on a daily basis, morning and night, without any warnings. And as a result of June's death there have been a number of other deaths that have been discovered that have all been associated with the use of this tea. And, in fact, it isn't safe. And, like a lot of products that are sold as dietary supplements, nobody does any testing on them. And I think people going into reputable food stores, health food stores, drug stores, assume that someone's tested them—if not the company, the government. And the fact of the matter is that that's simply not the case.

WINFREY: All right. Thank you very much. In a survey of American cities, it was found that over 100—100—had unsafe levels of lead. Erik Olsen is with the Natural Resources Defense Council.

We're out of time. And what's the one thing we can do to increase the safety of our drinking water?

Mr. ERIK OLSEN (Natural Resources Defense Council): Well, it's very easy to fix the problem. It's just been we've had a lot of problems with politicians not willing to invest the money that's necessary. It costs a few pennies per day to have water that's safe to drink, but now we have people in Congress that are trying to roll back not just the requirements for food safety, but for our drinking water. We could fix it easily. It's just we have a lot of resistance to doing it.

WINFREY: Well, we've learned a lot today. I know a lot of you are not going to eat meat after this, raw oysters, drink tea or even water. What are we going to do? No, I don't want to alarm people. But it's been very interesting.

Connie, thank you for that test. We learned a lot. We learned a lot.

Ms. DIEKMAN: I hope you passed.

WINFREY: Thank you. I didn't pass. I've been doing things wrong.

Ms. DIEKMAN: But you will from now on.

WINFREY: I will from now on. Thank you very much. We've been lucky—lucky. Thank you all very much. Beryl, thank you. Beryl.

Copyright © 1996 Harpo Productions Inc

-22-

HAR 1654

*APPENDIX B*

*FINAL JUDGMENT*

The Court having granted summary judgment in favor of Defendant KING WORLD PRODUCTIONS, INC., and the Court having granted Defendants' motion for a directed verdict as to all of Plaintiffs' claims except for their business disparagement claim, and the Jury having returned a Defendants' verdict on that claim, it is therefore ORDERED, ADJUDGED and DECREED.

That Plaintiffs TEXAS BEEF GROUP, PERRYTON FEEDERS, INC., MALTESE CROSS CATTLE COMPANY, BRAVO

CATTLE COMPANY, ALPHA 3 CATTLE COMPANY, PAUL F. ENGLER, CACTUS FEEDERS, INC., CACTUS GROWERS, INC., and DRIPPING SPRINGS CATTLE COMPANY take nothing from Defendants OPRAH WINFREY, HARPO PRODUCTIONS, INC., HOWARD LYMAN, and KING WORLD PRODUCTIONS, INC., and that the Defendants are entitled to their costs in this action.

It is SO ORDERED, ADJUDGED and DECREED.