United States Court of Appeals,

Fifth Circuit.

No. 96-50253.

PETER SCALAMANDRE & SONS, INC., et al., Plaintiffs,

Merco Joint Venture, Plaintiff-Counter Defendant-Appellee,

v.

Hugh B. KAUFMAN, et al., Defendants,

Hugh B. Kaufman;  TriStar Television, Inc., Defendants-Counter Plaintiffs-Appellants.

June 3, 1997.

Appeals from the United States District Court for the Western District of Texas.

Before DUHÉ, BENAVIDES and STEWART, Circuit Judges.

DUHÉ, Circuit Judge:

Appellants Hugh B. Kaufman and TriStar Television appeal a defamation judgment awarding Appellee Merco Joint Venture nominal damages of $1 against each appellant, and punitive damages of $500,000 against Kaufman and $4.5 million against TriStar.  Because Merco failed to prove actual malice, we reverse and render judgment for Appellants.

Background

In 1989, New York City entered into a consent decree to cease disposing of its "sewer sludge" by dumping it into the ocean.  Sewer sludge is what remains, in solid form, after wastewater from city sewers is processed and treated.  New York City was in dire need of a new way to dispose of its sewer sludge, and Merco Joint Venture was formed to provide a solution to this dilemma.  In 1992,

1

the city contracted with Merco to dispose of up to thirty percent of the city's sewer sludge.[1]

Merco originally planned to ship the sludge to Oklahoma, and dispose of it by spreading it on grassland. However, Merco could not comply with Oklahoma environmental regulations in time to accommodate its contract. Merco promptly chose Sierra Blanca, a town in West Texas, as the new destination for the sludge. Merco obtained state permits to spread sludge in Texas in less than a month. Merco purchased a ranch in Sierra Blanca as a disposal site for the sludge shipments, which began arriving in July 1992. When sludge arrived from New York, Merco applied it to the ground at the ranch as a fertilizer would be applied.

In the spring of 1994, a television show produced by TriStar entitled "TV Nation" began developing a program segment focusing on New York's sludge shipments to Texas. The show's creator, Michael Moore, intended the program to be a reality-based television show that used humor and satire to explore public issues and current events.

The "germ" of the idea for the sludge segment came from a memorandum written by a TV Nation staffer. The memorandum proposed the segment follow a load of sludge from the sewage plant in New York, as it was hauled down to Texas on a train, and finally to the Merco ranch at Sierra Blanca.[2] The memo styled the proposed

_____

[1]For its six year sludge disposal contract with the city, Merco will receive approximately $168 million.

[2]The original concept was later altered when the railroad would not allow TV Nation to ride the sludge train.

segment as "a piece about the socioeconomics of waste, about who gets—literally—shat upon."

Development of the segment was assigned to Fran Alswang, a TV Nation producer. Alswang studied publications on sludge, and eventually visited Sierra Blanca on a scouting trip. On that trip, she went to the Merco ranch, spoke with Merco's media director, Kelly Sarber, and talked with both supporters and opponents of the operation in Sierra Blanca. Alswang finished the scouting trip with the impression the people of Sierra Blanca were divided over whether or not the Merco ranch was beneficial to the town.

After Alswang completed her research, the sludge segment was videotaped in June 1994. Roy Sekoff was the on-air correspondent for the piece. TV Nation spent its first day of filming at a sewage plant in New York, then flew to Texas and taped at the Merco ranch and around Sierra Blanca. Sekoff interviewed several persons, both those associated with the ranch and those opposed to the Merco operation.

When Alswang had prepared a preliminary "rough cut" of the segment, she submitted it to her superiors for legal and creative review. The reviewers suggested she find someone to respond to Kelly Sarber's positive testimonial on the merits of sludge.

To counter Sarber, Alswang contacted Hugh Kaufman, a twenty-five year EPA employee whose name she had come across in her research. Kaufman told Alswang he was authorized to speak on sludge as an EPA representative, and that his superiors at the EPA gave him permission to proceed. Alswang interviewed Kaufman and

3

added portions of that interview, which questioned the safety of Merco's practices, to her segment.

Alswang submitted a second rough cut of the sludge segment, edited to include Kaufman's comments, for legal review. As support for Kaufman's comments, she sent the legal department several documents disputing the safety of sludge land application. Final revisions were made, Alswang received approval for broadcast, and the segment entitled "Sludge Train" was broadcast on August 2, 1994.

Merco was irate at the content of the broadcast, which it contends was an unbalanced report on sewer sludge and Merco's practices at Sierra Blanca. After "Sludge Train" aired, Merco sued alleging that nine portions of the Sludge Train segment were defamatory, disparaging and false. Merco sued TriStar, Hugh Kaufman, Roy Sekoff, Billy Addington (a resident of Sierra Blanca who opposed the Merco operation), and Tri-State Broadcasting Co. Merco dismissed all defendants except TriStar, Kaufman and Sekoff on the eve of trial. At the close of Merco's case, the trial judge granted Sekoff's motion for judgment as a matter of law.

The jury awarded Merco nominal damages of $2, and punitive damages of $500,000 against Kaufman and $4.5 million against TriStar. TriStar and Kaufman unsuccessfully moved for judgment as a matter of law, and the trial judge entered judgment against TriStar and Kaufman for the amount of the jury award. Kaufman and TriStar appeal.

I.

4

TriStar and Kaufman appeal on two grounds.  They first contend Merco failed to prove TriStar and Kaufman acted with actual malice. They next argue that, as the jury awarded only $2 total in actual damages, the district court erred under both Texas and constitutional law when it entered judgment for Merco on $4.5 million and $500,000 in punitive damages.

## II.

We first address whether Merco met its burden of proving TriStar and Kaufman acted with actual malice when they allegedly defamed Merco.

State libel law's reach is curtailed by the constitutional guarantees of freedom of speech and freedom of the press. *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 30, 91 S.Ct. 1811, 1813, 29 L.Ed.2d 296 (1971).  If a plaintiff alleging defamation is considered a "public figure,"[3] or a person or entity whose views and actions on public issues and events are of concern to other citizens, *Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 162, 87 S.Ct. 1975, 1995, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring), that plaintiff must prove the alleged defamation was "made with "actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  *New York Times Co. v. Sullivan,* 376 U.S. 254, 279-280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).

Because of the requirement in "public figure" defamation

---

[3]For the purposes of this litigation, Merco stipulated to its public figure status.

cases that a defendant have acted with actual malice, our standard of review is different from the deferential "clearly erroneous" standard mandated by Rule 52(a). Rather, in such cases, we have an obligation to make an independent examination of the entire record to ensure the judgment is supported by clear and convincing evidence of actual malice. *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984). However, this obligation extends only to the ultimate factual finding of actual malice; we do not conduct *de novo* review of the jury's determination of preliminary factual issues or questions of credibility. *Brown v. Petrolite Corp.,* 965 F.2d 38, 46 (5th Cir.1992).

Proving actual malice is a heavy burden. Proof that a defendant broadcast false statements will not alone show actual malice—the Supreme Court has made clear there is a significant difference between proof of actual malice and proof of falsity. *Bose Corp.,* 466 U.S. at 511, 104 S.Ct. at 1965. Proof that a defendant spoke out of dislike, or with ill will towards another, also does not automatically meet the test of actual malice, even if his statements are shown to be false. *Garrison v. Louisiana,* 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). If a publication is undertaken in good faith, failure to investigate the subject of that publication will not in itself establish actual malice. *St. Amant v. Thompson,* 390 U.S. 727, 733, 88 S.Ct. 1323, 1326-27, 20 L.Ed.2d 262 (1968). That a defendant publishes statements anticipating financial gain likewise fails to prove

6

actual malice: a profit motive does not strip communications of constitutional protections. *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 667, 109 S.Ct. 2678, 2685-86, 105 L.Ed.2d 562 (1989). As long as a defendant does not act knowing his statement is false or with reckless disregard of its truth, actual malice will not be present.

There are no set criteria to measure when a defendant's actions constitute "reckless disregard" of the truth. The Court has noted that " "[r]eckless disregard' ... cannot be fully encompassed in one infallible definition." *St. Amant,* 390 U.S. at 730, 88 S.Ct. at 1325. "A "reckless disregard' for the truth, however, requires more than a departure from reasonably prudent conduct." *Harte-Hanks,* 491 U.S. at 688, 109 S.Ct. at 2696. The standard for reckless disregard "is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant actually had a "high degree of awareness of ... probable falsity'." *Harte-Hanks,* 491 U.S. at 688, 109 S.Ct. at 2696 (quoting *Garrison,* 379 U.S. at 74, 85 S.Ct. at 215-16). The purpose of such a flexible standard is to ensure defendants have some degree of culpability before they are found liable for defamation. *Herbert v. Lando,* 441 U.S. 153, 171-72, 99 S.Ct. 1635, 1646-47, 60 L.Ed.2d 115 (1979).

In short, "the actual malice standard is not satisfied merely through a showing of ill will or "malice' in the ordinary sense of the term." *Harte-Hanks,* 491 U.S. at 666, 109 S.Ct. at 2685. Culpability on the part of the defendant is essential. "There must

7

be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325. That evidence is lacking here.

## III.

Merco has continually asserted sludge application at its Sierra Blanca ranch increases vegetation on arid grassland, adds nutrients to the soil, and conditions the soil to make better use of a limited water supply. Merco claims that "Sludge Train" was an unwarranted attack on the land application of sludge and the Sierra Blanca operation.

Merco argues that TriStar intended from the start to present a negative, one-sided view of the sludge project. It cites the original concept memorandum discussing "the socioeconomics of waste" as evidence of TriStar's prejudice. It claims Fran Alswang and TriStar deceitfully obtained the cooperation of Merco and Merco supporters by indicating the piece would be complimentary.

Merco also contends TriStar erred in interviewing Kaufman, as he is a "renegade" notorious for his "whistleblower" activities and has no authority at the EPA. Merco argues Alswang had read a Wall Street Journal article that should have informed her Kaufman was not an authorized EPA spokesperson. Merco claims it provided Alswang with the names of "experts" who were better informed than Kaufman, but that Alswang sought out Kaufman solely because of his anti-sludge bias.

Appellants TriStar and Kaufman argue that, contrary to Merco's

8

claims, sludge has not been proven safe for land application and they fairly aired all points of view. Officials, scientists, and average citizens have debated the wisdom of spreading sludge on farmland.[4] Appellants also claim that, beyond the general dispute over the safety of sludge, Merco's operation in Sierra Blanca has itself been a topic of dissension. When it came to light how quickly Merco received state regulatory approval for its project, Merco was subjected to media scrutiny and criticism. Appellants note the Texas Water Commission later admitted its decision to grant Merco regulatory approval was made too quickly: subsequent to Merco's registration, the Commission imposed additional restrictions on the Sierra Blanca operation, and promulgated new rules related to the registration of beneficial use sites. TriStar stands by its decision to interview Kaufman, and argues other sources support Kaufman's views.

Merco's allegations of defamation are based on statements and alleged implications in the TV Nation segment, including statements that Merco was "an illegal haul and dump operation," that "[t]he people of Texas are being poisoned," that sludge contained "high levels of lead, mercury and PCBs," and an implication that Merco committed arson. Merco also claims other aspects of the segment amounted to defamation, such as the statement, "New York sludge cake isn't just made of toilet refuse. In fact, anything that goes down the drain or sewer ends up [in treatment plants]," interviews

---

[4]In fact, Merco stipulated for the purposes of this lawsuit that the Merco project is considered by some to be controversial.

9

with persons who were not residents of Sierra Blanca about the sludge odor, edited interview tapes with Judge Billy Love and Julie Porter that allegedly misrepresented their statements, and a metaphor about "the smell of money" Merco claims implied it bribed Judge Love.

Merco claims TriStar and Kaufman knew such statements were false, and therefore acted with actual malice when they made and broadcast those statements. We disagree. Merco has not met its burden of proving actual malice as to either TriStar or Kaufman. Merco presented no proof that TriStar and Kaufman knew, or should have known, that any part of the "Sludge Train" broadcast was false. Indeed, Merco failed to show any part of the broadcast actually *was* false.

Merco's objections to the "Sludge Train" broadcast result from its tendency to stretch every "implication" it finds in the broadcast to its farthest limit, then draw dubious conclusions from these unrealistic interpretations. It assumes viewers will automatically reach these same illogical conclusions, and bases its defamation claims on these assumptions.

The conclusion the evidence at trial suggests is that experts have yet to reach a consensus on the safety of land application of sludge. Merco itself conceded land application of sludge was controversial. At best, Merco's evidence proved certain experts believe sludge is safe. It did not, however, prove TriStar and Kaufman knew or should have known their position, evidenced by the TV Nation broadcast, was false, or that it was in fact false.

10

Kaufman's statements that Merco was "an illegal haul and dump operation," and that "[t]he people of Texas are being poisoned," were shown at trial to be Kaufman's honest beliefs, and were not so without basis as to constitute reckless disregard of the truth. Kaufman testified to several aspects of the Merco operation he found questionable, and noted instances when Merco had failed to comply with various regulations.

Kaufman professed his sincere belief that the land application of sludge is dangerous, and will eventually be proved harmful. His figurative reference to "poison" is hyperbolic, but exaggeration does not equal defamation. Merco repeatedly claims experts and agencies have stated sludge is safe, and argues those opinions prove Kaufman should have known his statements were false. However, these expert opinions are merely that—opinions. Moreover, because an "expert" endorses a certain practice does not mean all reasonable debate on the merits or safety of that practice is foreclosed.

Sekoff's voice-over comment that sludge contained "high levels of lead, mercury and PCBs" likewise failed to meet the standard of actual malice. The vagueness of the term "high levels" makes Merco's burden of proving defamation even more difficult. As well, the statement made no particular reference to Merco sludge, referring instead to sludge in general. Kaufman, who originally made the statement, based this assertion on numerous articles and reports questioning the safety of sludge and its contents. There was adequate support for the statement.

11

Merco's conclusion TriStar implied it committed arson stems from a portion of the segment showing a visit by Sekoff and Billy Addington to the remains of Addington's lumberyard. The lumberyard had burned; a police report attributed the cause of the fire to arson. In the segment, Sekoff stated in a voice-over that Addington was a sludge opponent, and that Addington believed his opposition "has made him some powerful enemies." Addington stated: "And many of the people of ... in town know why the arson happened, it was because of our speaking out against the sludge."

In the segment, Addington merely stated his beliefs—that his lumberyard was burned because he opposed bringing sludge to Sierra Blanca. Given that a police report found the fire was arson, Addington's belief that his involvement in a contentious dispute in his hometown provided the motive for this crime is not reckless and has not been proven false. Merco's name was not mentioned as a suspect.[5] While viewers could conclude Merco was somehow implicated in the arson, they were equally likely to believe some other supporter of sludge in Sierra Blanca was responsible for the fire.

The statements, "New York sludge cake isn't just made of toilet refuse. In fact, anything that goes down the drain or sewer ends up [in treatment plants]," did not defame Merco. Merco argues plastics and other sewer refuse, shown in the tape accompanying the statements, are screened out early in the wastewater process. The

_____

[5]In fact, TriStar edited out a reference to the company by Addington, who had actually stated his opposition to "the sludge and Merco" prompted the arson.

footage shown in the segment in no way impugned the character of Merco's sludge by implying that plastics and debris end up in the final sludge product.

Likewise, Merco's claim it was libeled because Sekoff stated the dump was "pungently real" to the residents of Sierra Blanca, then showed two brief interviews with persons who did not live in the town, is groundless. TriStar did not claim the women lived in Sierra Blanca. The women's statements supported the "pungently real" portion of Sekoff's voice-over by describing an odor present in Sierra Blanca. Their place of residence has no effect on their sense of smell.

Merco's claim TriStar committed libel by editing interview tapes with Judge Billy Love and Julie Porter, allegedly misrepresenting their statements, also fails. Everyone interviewed for the segment signed a personal release form allowing TV Nation to depict or portray them as the program in its discretion determined. The release also gave TV Nation the right to edit any statements or comments made on camera, and informed anyone who was interviewed their statements could be altered. It is common knowledge television programs such as TV Nation shoot more footage than necessary and edit the tape they collect down to a brief piece. TV Nation was entitled to edit the tape it shot to fit into the short time frame allotted to the sludge segment.

Finally, Merco's assertion that TriStar implied it bribed Judge Love by using a metaphor about "the smell of money" is without merit. Throughout the segment, Sekoff referred to the

13

"smell of money" in connection with the Merco operation, playing on the strong odor reportedly associated with the sludge ranch. When he spoke with Judge Love, Sekoff introduced the interview by stating, "Merco, however, does have its supporters in town. I followed the smell of money to the county courthouse where I met Judge Billy Love, whose land company profited from Merco's arrival."

At most, TriStar can be accused of implying Judge Love was a Merco supporter because he profited from the company's operation in Sierra Blanca. Such an implication is not libel. Judge Love, like many other citizens of Sierra Blanca, actually did benefit from Merco locating in town. These benefits to Sierra Blanca were the focus of the entire sludge segment: Sierra Blanca allowed the establishment of a waste disposal operation, despite the fears and concerns of certain residents, because the financial benefits outweighed other considerations. The profit Merco brings to Sierra Blanca is the "smell of money" Sekoff refers to in his voice-over.

In sum, while it is true the "Sludge Train" segment hardly endorsed the land application of sludge, it does not follow that TriStar libeled Merco because it chose to present an unenthusiastic account of Merco and the sludge ranch. The segment was not so onesided, or without basis in fact, as to constitute defamation. Merco is a public figure engaged in a controversial business, and should not be shocked that some disagree with its practices.

Merco's description of an "objective" segment appears suspiciously like a segment that supported Merco's position on the

14

sludge debate. However, TriStar and Kaufman are not liable for defamation because they refused to corroborate the Merco party line. Defamation law should not be used as a threat to force individuals to muzzle their truthful, reasonable opinions and beliefs. To endorse Merco's version of defamation law would be to disregard the constitutional protections that allow individuals to hold and express unpopular or unconventional opinions.

Because Merco failed to meet its difficult burden of proving actual malice by clear and convincing evidence, we find the district court erred in entering judgment for Merco on its defamation claims against TriStar and Kaufman.

IV.

As we find Merco did not present clear and convincing proof of actual malice on the part of TriStar or Hugh Kaufman, and reverse and render on that ground, we find it unnecessary to discuss Appellants' other point on appeal. However, we note that our resolution of this case on the ground of insufficient evidence in no way signals a retreat from the reasoning embraced in *Brown v. Petrolite Corp.,* 965 F.2d 38 (5th Cir.1992), where this Court reversed an award of $300,000 in punitive damages when the plaintiff was awarded only $1 in compensatory damages. Under Texas law at the time of trial,[6] this Court found when a plaintiff

_____

[6]Amendments allowing punitive damages, even if only nominal damages are awarded, upon a showing of malice have since gone into effect. TEX.CIV.PRAC. & REM.CODE ANN. § 41.004(b) (Vernon Supp.1996). However, those amendments apply only to causes of action accruing on or after September 1, 1995. TEX.CIV.PRAC. & REM.CODE ANN. § 41.001 historical & statutory notes (Vernon Supp.1996).

15

"suffered only nominal damages, the jury was not entitled to award exemplary damages." *Id.* at 49; *see Snead v. Redland Aggregates Ltd.,* 998 F.2d 1325, 1334-35 (5th Cir.1993). Texas law clearly establishes that "recovery of actual damages is prerequisite to receipt of exemplary damages." *Doubleday & Co., Inc. v. Rogers,* 674 S.W.2d 751, 754 (Tex.1984); *see Twin City Fire Ins. Co. v. Davis,* 904 S.W.2d 663, 665 (Tex.1995); *Newman v. Tropical Visions, Inc.,* 891 S.W.2d 713, 721 (Tex.App.—San Antonio 1994); *St. Paul Lloyd's Ins. Co. v. Fong Chun Huang,* 808 S.W.2d 524, 528 (Tex.App.—Houston (14th Dist.) 1991). Such a disproportionate award of punitive damages may also be unconstitutional. *BMW of North America, Inc. v. Gore,* --- U.S. ----, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

V.

As we find Merco failed to meet its burden of proving actual malice by clear and convincing evidence, we REVERSE the judgment of the district court and RENDER judgment for Appellants TriStar and Kaufman, that Merco take nothing.

REVERSED and RENDERED.

16