REVISED, MARCH 28, 2000

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 98-10391

---

TEXAS BEEF GROUP, ET AL,

Plaintiffs,

CACTUS GROWERS INC.,

Plaintiff-Appellant,

v.

OPRAH WINFREY, HARPO PRODUCTIONS INCORPORATED, HOWARD LYMAN
KING WORLD PRODUCTIONS, INCORPORATED,

Defendants-Appellees.

-------------------------------------------------------

PAUL F. ENGLER, CACTUS FEEDERS, INC.,

Plaintiffs-Appellants,

v.

OPRAH WINFREY, ET AL,

Defendants,

OPRAH WINFREY, HARPO PRODUCTIONS INCORPORATED, HOWARD LYMAN,
KING WORLD PRODUCTIONS, INCORPORATED,

Defendants-Appellees.

---

Appeal from the United States District Court for the
Northern District of Texas

---

February 9, 2000

Before JONES, STEWART, and DENNIS, Circuit Judges.

PER CURIAM:

At issue in this case is whether <u>The Oprah Winfrey Show</u> and one of its guests knowingly and falsely depicted American beef as unsafe in the wake of the British panic over "Mad Cow Disease." The district court doubted that fed cattle are protected by Texas's equivalent of a "Veggie Libel Law," <u>See</u> Tex. Civ. Prac. & Rem. § 96.01 <u>et seq.</u> The court alternately held that no knowingly false statements were made by the appellees. We affirm on the latter ground only and affirm the court's other rulings.

## I. INTRODUCTION

In early 1996, a new variant of Creutzfeldt-Jakob Disease ("CJD") was diagnosed in Britain. CJD, a form of Transmissible Spongiform Encephalopathy, is a fatal disease that affects the human brain. On March 20, 1996, the British Ministry of Health announced that scientists had linked the consumption of beef infected with Bovine Spongiform Encephalopathy ("BSE") with this new CJD variant. BSE, or "Mad Cow Disease," had been detected in British cattle as early as 1986.[1] Also a form of Transmissible Spongiform Encephalopathy, BSE triggers a deadly, degenerative brain condition in cattle. BSE is most likely to arise when cattle are fed contaminated ruminant-derived protein supplements, which are made from rendered cattle and sheep.

The postulated link between the consumption of beef and CJD caused panic in Britain. News media in the United States ran numerous stories on the subject. Articles appeared in, inter alia, the New York Times, The Wall Street Journal, and Newsweek. Dateline, a popular, "prime time" television news program, broadcast a report on the subject. See Texas Beef Group v. Winfrey, 11 F. Supp. 2d 858, 861 (N.D. Tex. 1998). Another report, and the subject of this suit, was aired on the "Dangerous Food" broadcast of the Oprah Winfrey Show.

Asserting that the beef market suffered substantial losses following the broadcast, several Texas cattle ranchers sued

---

[1] Subsequently, BSE has been identified in Irish, Canadian, and other European cattle.

Oprah Winfrey, the producers and distributors of the <u>Oprah Winfrey Show</u>, and Howard Lyman, a guest on the show, in Texas state court. The cattlemen alleged violations of the Texas False Disparagement of Perishable Food Products Act, Tex. Civ. Prac. & Rem. §§ 96.001-.004 ("the Act"), and damages arising from the common-law torts of business disparagement, defamation, negligence, and negligence per se. The cattlemen's suit was removed to federal court. At the close of the cattlemen's case-in-chief, the district court culled the majority of the pending claims, saving only the business disparagement cause of action. This claim was rejected by the jury, and the cattlemen have appealed. Although we differ with the district court's reasoning on certain issues, we affirm.

## II. FACTUAL BACKGROUND

### A. The "Dangerous Food" Show

As the British public panicked over the human victims in their country and over the announcement of a possible link between BSE and new-variant CJD, employees of the <u>Oprah Winfrey Show</u>[2] laid the groundwork for an episode covering the hidden dangers in food. Alice McGee, a senior supervising producer for the <u>Oprah Winfrey Show</u>, and James Kelley, an editor, held a brainstorming session and decided that "dangerous food" would be a good topic for a show. The two approached Diane Hudson, the <u>Oprah Winfrey Show</u>'s executive producer, regarding the topic, and she approved, so long as BSE was

---

[2] The <u>Oprah Winfrey Show</u> is a talk show hosted by Oprah Winfrey, produced by Harpo Productions, Inc. ("Harpo Productions"), and distributed by King World Productions, Inc. ("King World"). Winfrey is the sole shareholder and Chief Executive Officer of Harpo Productions. The appellees are not pursuing an appeal of the summary judgment in favor of King World.

3

not the only issue discussed.  Kelley began preparing for the show and assigned members of his production team to research the "Mad Cow Disease" topic.  Three weeks before the taping of the "Dangerous Food" show, Andrea Wishom, a researcher for the Oprah Winfrey Show, conducted research and interviewed individuals who were knowledgeable about CJD and "Mad Cow Disease."  During her research, Wishom discovered that the Center for Disease Control, the U.S. Department of Agriculture, and several professors and researchers felt that "Mad Cow Disease" could not occur in the United States.  In telephone conversations, however, Wishom learned that Lyman believed "Mad Cow Disease" could produce an epidemic in this country worse than AIDS.  Wishom spoke with each potential guest on the telephone, discussed her research with Kelley and summarized research for Winfrey's use during preparation and taping of the show.

On April 11, 1996, the "Dangerous Food" episode of the Oprah Winfrey Show was taped in Chicago, Illinois.  Guests on the show included Lyman,[3] Dr. Gary Weber,[4] Dr. Will Hueston,[5] Linda Marler, Dr. James Miller,[6] and Beryl Rimmer.  During the taping,

---

[3]     Lyman is a former cattle rancher turned vegetarian and an activist for the Humane Society.

[4]     Dr. Weber holds a Ph.D. in Animal Science.  Dr. Weber represents the National Cattlemen's Beef Association.

[5]     Dr. Hueston, representing the U.S. Department of Agriculture, is a leading expert on "BSE."

[6]     Dr. Miller is a physician with experience treating individuals afflicted with CJD.  He was the treating physician for Linda Marler's mother-in-law.  Marler was also a guest on the "Dangerous Food" show.

Winfrey discussed several topics with her guests, including the discovery of new-variant CJD in Britain, the gruesome symptoms of the disease, the impact of the disease on the families of those stricken, the threat of the disease in the United States, and the steps being taken by cattlemen and the U.S. Department of Agriculture to prevent an outbreak of BSE in this country. Over the course of the taping, Lyman made several statements regarding the threat of BSE in the United States that Drs. Weber and Hueston found misleading. The experts responded to these statements with facts designed to show the cautious response that the United States had taken to the threat of BSE. They explained the extensive animal testing and oversight used to discover and prevent the spread of BSE in United States cattle. They noted that these procedures had been in place for nearly a decade and that no case of BSE had ever been reported in the United States. They also pointed out that cattlemen voluntarily banned on ruminant-to-ruminant feeding while the Department of Agriculture considered a mandatory ban on the practice.

After the taping, Kelley edited extensively to pare down the "Mad Cow Disease" segment for broadcast.[7] From approximately eight minutes of Dr. Hueston's statements recorded during the taping, only 37 seconds remained in the broadcast. As instructed by Winfrey and McGee, Kelley cut out "the redundancies" in Dr.

---

[7] The "Mad Cow Disease" segment formed only a part of the day's show. Other segments, not challenged here, involved the dangers from meat (including hamburger) infected with E. coli bacteria; food handling tips; a tour of a Chicago restaurant; and discussions about the hazards of eating oysters, drinking diet herbal tea, and public water supplies.

Weber's and Dr. Hueston's interviews. These "redundancies" included portions of the following: (1) Dr. Weber's references to the voluntary ban on ruminant-to-ruminant feeding, (2) Dr. Weber's explanation of what ruminant-to-ruminant feeding entailed, (3) Dr. Weber's distinctions between Britain's approach to BSE and the United States's more careful approach, (4) Dr. Weber's response to an audience member's question concerning the examination of cattle before slaughter, and (5) most of Dr. Hueston's comments, including a description of the safeguards against slaughter-house processing of sick cattle. Also edited out was Lyman's admission that American beef is safe. None of Dr. Miller's statements appeared in the show as broadcast. The edited show was broadcast on April 16, 1996.

B. *The Oprah Crash*

Following the April 16, 1996, broadcast of the "Dangerous Food" program, the fed cattle market in the Texas Panhandle dropped drastically. In the week before the show aired, finished cattle sold for approximately $61.90 per hundred weight. After the show, the price of finished cattle dropped as low as the mid-50's; the volume of sales also went down. The cattlemen assert that the depression continued for approximately eleven weeks.

The depression in cattle prices reverberated in national fed cattle markets as well. W. Winfred Moore, II, a commodities trader on the floor of the Chicago Mercantile Exchange, reported the impact that the "Dangerous Food" show had on the live cattle futures market. He recalled the stir the show created in the

6

trading pit, both before and after broadcast. Moore explained that the fear inspired by the show caused futures prices to decline by $1.50 per hundred weight -- the limit-down for the market. The market reached the limit-down within an hour of the Oprah Winfrey Show's 9:00 a.m. broadcast, and the Mercantile Exchange closed the live cattle market for the day.

Cash fed cattle markets suffered a similar fate. Dr. Wayne D. Purcell, an expert in agricultural economics and livestock marketing, concluded that "a significant and rather dramatic shock impacted the cash fed cattle market during [the week of] April 16, 1996." Dr. Purcell went on to testify that the aftereffect of this shock was felt in the cash market through July 1996 and perhaps into the fall of 1996.

C. "Mad Cow Disease" Revisited

News of the "Oprah Crash" spread quickly, and several cattlemen complained to the Oprah Winfrey Show. Sensitive to their accusations of unfairness, Winfrey invited Dr. Weber and a cattle rancher, but not Lyman, to a show aired one week later to refute the "Dangerous Food" broadcast. Dr. Weber reexplained the voluntary ban, and anticipated permit ban, on ruminant-to-ruminant feeding. He explained the purpose of ruminant-to-ruminant feeding and the limited extent of its practice. He reiterated that no BSE had ever been found in this country. Dr. Weber concluded by reassuring viewers that cattlemen were doing "everything it takes to protect the health of . . . cattle and . . . consumers."

Thanking Winfrey for airing the new show, the president of the National Cattlemen's Beef Association wrote,

> On behalf of more than a million U.S. cattle producers, I want to thank you for allowing us to present the truth about feeding animal-based protein supplements and the British cattle disease BSE . . . . It was a service to consumers and a great relief to many of my fellow cattlemen.

## III. PROCEDURAL HISTORY

On May 28, 1996, Paul F. Engler and Cactus Feeders, Inc., filed suit against Winfrey, Harpo Productions, Lyman, and Cannan Communications, Inc. ("Cannan"), in Texas state court. Three days later, on May 31, Engler and Cactus Feeders filed a motion to nonsuit Cannan. On June 5, the plaintiffs filed their first amended petition, renaming Cannan as a defendant. On June 6, however, the trial court granted the plaintiffs' May 31 motion to nonsuit Cannan.

As Cannan had been the only non-diverse defendant, the remaining defendants filed a notice of removal on June 21. From June 6 until the filing of the removal notice, the plaintiffs did not move to rejoin Cannan as a defendant in state court. In federal district court, the removing defendants argued that the June 6 nonsuit operated to dismiss Cannan as a defendant from the June 5 first amended complaint and, regardless, that Cannan had been fraudulently joined in the state action to defeat diversity. On motion to remand, the plaintiffs maintained that their May 31 motion to nonsuit applied only to their original complaint and that Cannan had not been fraudulently joined. The district court found that the plaintiffs' motion to nonsuit was effective only after it

**8**

had been signed in Texas state court and, thus, that the nonsuit was effective as to the first amended complaint. Although the state court nonsuit was voluntary and without prejudice, the plaintiffs did not attempt to rejoin Cannan in any amended pleading filed in federal court.

The case moved to trial before a jury.[8] At the close of the plaintiffs' case-in-chief, the defendants moved for judgment as a matter of law on all of the pending claims. The district court granted the motion only with respect to the plaintiffs' claim under the False Disparagement of Perishable Food Products Act. See Texas Beef Group, 11 F. Supp. 2d at 862-63. The district court rested its decision on several bases. First, the district court questioned the applicability of the statute to live "fed cattle." See id. at 863. Second, the court disputed whether the plaintiffs' cattle "perished" or "decayed beyond marketability" as required for statutory protection. See id. Alternatively, the district court ruled that the case was not cognizable under the Act because insufficient proof had been offered tending to show the defendants had knowingly disseminated false information. See id.[9]

The district court submitted only the plaintiffs' business disparagement claim to the jury. The jury was charged as follows:

---

[8] Following removal, this case was consolidated with a pending federal claim -- Texas Beef Group v. Winfrey, No. 2-96-CV-208-J.

[9] The district court also dismissed the plaintiffs' claims of common law defamation, statutory libel, negligence, and negligence per se. See Texas Beef Group, 11 F. Supp. 2d at 862-65. The appellants do not appeal from these dismissals.

9

To recover on a claim of business disparagement, a plaintiff must prove the following:

> (1) That the Defendant published a false, disparaging statement;
>
> (2) That the statement was "of and concerning" a Plaintiff's specific property;
>
> (3) That the statement was made with knowledge of the falsity of the disparaging statement or with reckless disregard concerning its falsity, or with spite, ill will, and evil motive, or intending to interfere in the economic interests of the Plaintiff in an unprivileged fashion; and
>
> (4) That the disparaging statement played a substantial and direct part in inducing specific damage to the business interests of the Plaintiff in question.

* * * *

> For the statement to be "of and concerning" a Plaintiff's specific business property, the disparaging words must refer to an ascertained or ascertainable business, and it must be the Plaintiff's. The law does not allow the jury to connect the allegedly disparaging statements to a Plaintiff on innuendo or presumption alone. While it is not necessary that the publication have mentioned a Plaintiff by name, the facts and circumstances must be such [that] they point to the Plaintiff as the person concerning whom the alleged disparaging statements are made. Every listener does not have to understand the alleged disparaging statements to refer to the individual Plaintiff as long as there are some who reasonably do.

The question submitted to the jury asked,

> Did a below-named Defendant publish a false, disparaging statement that was of and concerning the cattle of a below-named Plaintiff as those terms have been defined for you?

The plaintiffs objected to "insertion of the 'of and concerning' requirement" in the jury charge. The district court overruled the objection, and the jury returned an answer of "no" to the proffered

10

question.  From the district court's adverse rulings and judgment, the cattlemen timely appealed to this court.

## IV.  ANALYSIS

### A.  *Jurisdiction*

The cattlemen first urge that the district court had no diversity jurisdiction to entertain their suit.  This court reviews de novo a district court's denial of a motion to remand.  See Herron v. Continental Airlines, Inc., 73 F.3d 57, 58 (5th Cir. 1996).  A party seeking to remove a suit from state court must prove subject matter jurisdiction in the district court.  See Allen v. R & H Oil & Gas Co., 63 F.3d 1326, 1335 (5th Cir. 1995).  When removal is based on diversity of citizenship, diversity must exist at the time of removal.  14B. C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3723, at 574-75 (1998 ed.) (hereafter Wright, Miller and Cooper).  Even though removal may have been improper due to a lack of diversity jurisdiction at the time of removal, if the defect is later cured before it is noticed, the federal court has subject matter jurisdiction to enter judgment.  See Wright, Miller & Cooper, Id. at 588-89; Caterpillar Inc. v. Lewis, 519 U.S. 61, 75-77, 117 S. Ct. 467, 476-77 (1996).  Such a finding is appropriate -- given considerations of finality, efficiency, and economy -- when diversity existed at the beginning of trial and at the rendering of judgment.  See id.

Caterpillar is dispositive here.  The cattlemen maintain that their motion to nonsuit Cannan, filed before the first amended state court complaint but granted after the first amended complaint

11

was filed, dismissed Cannan only from the original complaint and, thus, that Cannan was a non-diverse party to the amended suit upon removal. Their argument turns on the interpretation of Texas procedural law whose application in this case is far from clear.[10] But even if the district court erred in holding that Cannan was not a party defendant at the time of removal, its error falls precisely under the Caterpillar holding. In Caterpillar, the district court erroneously denied a motion to remand and the case proceeded in federal court. See 519 U.S. at 70, 117 S. Ct. at 473. Prior to trial, the intervening plaintiff and the non-diverse defendant settled -- and diversity was finally established. See id. at 66-67, 117 S. Ct. at 471-72. The unanimous Supreme Court held that "overwhelming" considerations of finality, efficiency, and judicial economy militated against a remand to state court when the original jurisdictional defect had not "lingered through judgment." See id. at 75-77, 117 S. Ct. 476-77.

The cattlemen's effort to distinguish Caterpillar is unpersuasive. Though the cattlemen accurately observe that the

_____

[10] Texas case law on this issue is confusing. While the signing of a motion to nonsuit is indeed viewed by Texas courts as a ministerial act, the signing does have important implications for appellate timetables. See Farmer v. Ben E. Keith Co., 907 S.W.2d 495, 496-97 (Tex. 1995); Harris County Appraisal Dist. v. Wittig, 881 S.W.2d 193, 194 (Tex. App.-Houston [1st Dist.] 1994, orig. proceeding); Avmanco, Inc. v. City of Grand Prairie, 835 S.W.2d 160, 163 (Tex. App.-Fort Worth 1992, appeal dism'd as moot). Wittig reminds that no Texas court has found that a motion to nonsuit is effective immediately upon filing, see 881 S.W.2d at 195, but the Texas Supreme Court's opinion in Greenberg v. Brookshire, 640 S.W.2d 870, 871-72 (Tex. 1982), gave immediate effect to a motion for nonsuit filed under circumstances quite similar to this case. Though subsequent cases such as Farmer, Wittig, and Avmanco have clarified its holding, Greenberg remains relatively unblemished by the march of Texas law. In fact, in their initial notice of removal, the appellees cited Greenberg for this very proposition -- their amended notice of removal deleted the citation. Given our reliance upon Caterpillar, however, it is unnecessary to speculate on this issue any further.

**12**

non-diverse defendant in <u>Caterpillar</u> was voluntarily withdrawn from the action, they could have amended their complaint in federal court to rejoin Cannan, and they could even have moved again to remand. See <u>Hensgens v. Deere & Co.</u>, 833 F.2d 1179, 1182 (5th Cir. 1987). The district court's ruling on the motion to remand did not foreclose such an amendment. When they were given the opportunity to amend at the district court, the cattlemen made no effort to rejoin Cannan, assuring the district court instead that "[s]tate court is <u>not</u> the Plaintiffs' preferred forum." Cannan is absent from the litigation because of the cattlemen's choice. And, as in <u>Caterpillar</u>, the case went to trial and resulted in a judgment founded on complete diversity. The ultimate scope of <u>Caterpillar</u> may be unclear. See, e.g., <u>Lexecon v. Milberg Weiss Bershad Haynes & Lerach</u>, ___ U.S. ___ 118 S.Ct. 956, 965-66; 14B. <u>Wright, Miller & Cooper</u>, § 3723, at 588 (describing the "somewhat more contentious and as yet undefined doctrine" of <u>Caterpillar</u>). Nevertheless, the instant case falls comfortably within its exact rationale.

B.   *False Disparagement of Perishable Food Products Act*

In 1995, the Texas legislature passed the Act, following closely on the heels of the Alar apple scare. See generally <u>Auvil v. CBS "60 Minutes"</u>, 800 F. Supp. 928 (E.D. Wash. 1992), <u>aff'd</u>, 67 F.3d 816 (9th Cir. 1995).

Under the Act, a person may be held liable for damages sustained by the producer of a perishable food product if that person knowingly disseminates false information to the public stating or implying that the producer's product is not safe for

**13**

public consumption.  See Tex. Civ. Prac. & Rem. § 96.002.  A "perishable food product" is defined by the Act as "a food product of agriculture or aquaculture that is sold or distributed in a form that will perish or decay beyond marketability within a limited period of time."  Tex. Civ. Prac. & Rem. § 96.001.  When considering the falsity of the disseminated information, the trier of fact is instructed to determine "whether the information was based on reasonable and reliable scientific inquiry, facts, or data."  Tex. Civ. Prac. & Rem. § 96.003.  This litigation represents one of the first applications of the Act.  At trial, the parties disputed whether appellants' live cattle are a "perishable food product" protected under the Act and whether, in any event, the appellees knowingly disseminated false information about live cattle.  Although the district court found that, on the facts before it, the fed cattle did not "decay beyond marketability" and thus did not fall within the statute's coverage, we do not reach that issue here.  The court alternatively held that the appellees did not knowingly disseminate false information about beef.  We turn to that issue.[11]

When a district court grants a motion for judgment as a matter of law at the close of evidence, this court reviews the decision *de novo*, applying the same legal standard as the district court.  See Price v. Marathon Cheese Corp., 119 F.3d 330, 333 (5th Cir. 1997).  In our review, all evidence is considered in the light

---

[11]     The appellees do not raise on appeal any arguments concerning the constitutionality of the Act.

most favorable to the nonmovant.  See id.  If, after drawing all inferences in the nonmovant's favor, "there is no legally sufficient evidentiary basis for a reasonable jury" to find for the nonmovant, judgment as a matter of law is appropriate.  See id. (quoting Fed. R. Civ. P. 50(a)).

The critical issue here is whether the appellees knowingly disseminated false information tending to show that American beef is not fit for public consumption.  Tex. Civ. Prac. & Rem. § 96.002(a).  The requirement of knowledge that the information is false is the highest standard available in the law. It is unnecessary to import First Amendment free speech protections in further embroidery of this already-stringent standard, except to note that the expression of opinions as well as facts is constitutionally protected so long as a factual basis underlies the opinion.  Peter Scalamandre & Sons, Inc. v. Kaufman, 113 F.3d 556, 562 (5th Cir. 1997); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 17-23, 110 S.Ct. 2695, 2705-08 (1990) (discussing protections afforded "opinions" under First Amendment).  There is little doubt that Howard Lyman and the Winfrey show employees melodramatized the "Mad Cow Disease" scare and discussion of the question "Can it happen here?"  Perhaps most important, from the audience's viewpoint, was not the give-and-take between the glib Lyman and the dry Drs. Weber and Hueston, but Ms. Winfrey's exclamation that she was "stopped cold from eating another burger." When Ms. Winfrey speaks, America listens.  But her statement is neither actionable nor claimed to be so.  Instead, two false

**15**

statements by Lyman and misleading editing are relied upon to carry the cattlemen's difficult burden.  Like the district court, we hold they have not sustained their burden of articulating a genuine issue of material fact concerning liability under the Act.

Branding Lyman an extremist, the cattlemen cite two of his inflammatory statements during the April 16 <u>Oprah Winfrey Show</u>. First, the cattlemen challenge as patently false Lyman's assertion that "Mad Cow Disease" could make AIDS look like the common cold. Second, they maintain that Lyman falsely accused the United States of treating BSE as a public relations issue, as Great Britain did, and failing to take any "substantial" measures to prevent a BSE outbreak in this country.  At the time of the show's broadcast, the factual basis for Lyman's opinions -- the continued existence of ruminant-to-ruminant feeding in the United States -- was truthful. The feeding practice continued to a limited extent, despite a voluntary ban; Dr. Weber admitted as much.  Based on this fact, Lyman held the belief that "Mad Cow Disease" could exist or be discovered in this country and could endanger the lives of those eating American beef.  His statement comparing Mad Cow Disease to AIDS was hyperbolic, and Winfrey highlighted the statement as "extreme" during the show's broadcast.  As this court noted in <u>Scalamandre</u>, "exaggeration does not equal defamation."  <u>See</u> 113 F.3d at 562.  Lyman's statements comparing the United States' cattlemen's and government's reaction to BSE to that in Great Britain and bewailing the failure to take any "<u>substantial</u> steps" to prevent a BSE outbreak in this country were a sincerely held

**16**

opinion supported by the factual premise that only a mandatory ban on ruminant-to-ruminant feeding would disperse with the danger. The FDA imposed such a ban, with the approval of the cattle industry, only months after the Oprah Winfrey Show.  See id.

Lyman's opinions, though strongly stated, were based on truthful, established fact, and are not actionable under the First Amendment.  See id. at 564 ("Defamation law should not be used as a threat of force individuals to muzzle their truthful, reasonable opinions and beliefs.").  Neither of Lyman's statements contained a provably false factual connotation, see Milkovich, 497 U.S. at 20, 110 S. Ct. at 2706, and both were based on factually accurate premises.  Most telling is Dr. Hueston's public comment about Howard Lyman, edited out of the final version of the show, which acknowledged that Lyman's ability to display his opinions is what makes America great and "keeps us the best."  On the evidence presented, no reasonable juror could have held that Lyman's views were knowingly false.  See Omnitech Int'l, Inc. v. Clorox Co., 11 F.3d 1316, 1323 (5th Cir. 1994).

Likewise, Winfrey and Harpo Productions may not be held liable for the editing of the "Dangerous Food" show.  This court rejected a similar claim in Scalamandre.  See 113 F.3d at 563. ("It is common knowledge television shows . . . shoot more footage than necessary and edit the tape they collect down to a brief piece.")  This broadcast of the Oprah Winfrey Show was no different from the news report in Scalamandre.  While the editor of the "Dangerous Food" show was instructed to cut out the redundancies in

**17**

the unedited interviews, he was also required to cut the piece to fit into a smaller time frame for the ultimate broadcast. Although the show's producer undeniably spliced questions and answers, the editing did not misrepresent Dr. Weber's responses. Moreover, through Lyman himself, the show introduced viewers to the voluntary ban on ruminant-to-ruminant feeding. The editing omitted factual explanations, such as the precise differences between cattle feeding and inspection practices in the United States and Great Britain. On the broadcast, however, Drs. Weber and Hueston disputed Lyman's arguments, described the steps the United States had taken to prevent the influx of BSE, and presented cogent arguments concerning the relative safety of United States beef.

The cattlemen's evidence regarding the editing of the "Dangerous Food" broadcast falls far short of satisfying the Act's standard for liability. Stripped to its essentials, the cattlemen's complaint is that the "Dangerous Food" show did not present the Mad Cow issue in the light most favorable to United States beef. This argument cannot prevail. Compare Scalamandre Scalamandre, 113 F.3d at 563-64. So long as the factual underpinnings remained accurate, as they did here, the editing did not give rise to an inference that knowingly false information was being disseminated.

C. Business Disparagement

The cattlemen finally challenge the district court's business disparagement instruction. Their complaint involves two alleged errors stemming from the "of and concerning" requirement in

**18**

the instructions. First, the cattlemen argue that the instruction unnecessarily required the jury to find that the appellees made a "false, disparaging statement" regarding their specific cattle. Second, the cattlemen urge that the instructions improperly demanded a finding that the "false, disparaging statement" was "of and concerning <u>the cattle</u>" of the plaintiffs -- as opposed to "of and concerning <u>beef</u>." At trial, however, the cattlemen's objection to this instruction was insufficiently specific to preserve the alleged errors.

Under Fed. R. Civ. P. 51, a party must object to a proposed jury instruction, "stating distinctly the matter objected to and the grounds of the objection." <u>See</u> <u>also</u> <u>Wood v. Diamond M Drilling Co.</u>, 691 F.2d 1165, 1169 (5th Cir. 1982). If a party fails to object with specificity to a proposed instruction, the right to challenge the instruction on appeal is waived. <u>See</u> <u>Nero v. Industrial Molding Corp.</u>, 167 F.3d 921, 932 (5th Cir. 1999). Regardless of this waiver, the court may review the instruction for plain error. In the civil context, a jury instruction is plainly erroneous when (1) an error occurred, (2) the error was clear or obvious, (3) substantial rights were affected, and (4) "not correcting the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings." <u>Id.</u>

By failing to object with specificity and offer a proposed instruction on the business disparagement issue, the cattlemen failed to preserve the alleged error in the charge. The cattlemen's vague objection to the business disparagement

**19**

instruction was insufficient to preserve their objection. <u>See</u> Fed. R. Civ. P. 51. Further, the cattlemen wholly failed to submit a specific alternate instruction on the issue to the district court. Again, this failure waives any error in the charge. <u>See</u> <u>Eiland v. Westinghouse Elec. Corp.</u>, 58 F.3d 176, 182 (5th Cir. 1995).

Our review of the record also does not permit a finding of plain error. Failing to correct the charge would not "seriously affect the fairness, integrity, or public reputation of judicial proceedings." <u>See</u> <u>Nero</u>, 167 F.3d at 932. The "of and concerning" requirement in defamation law, and its parameters, raise questions too important and uncertain of answer to be posed first in any depth in this court; appellants should have taken their best shot at this issue in the trial court.

## V. CONCLUSION

The cattlemen's procedural maneuvering enabled removal by the appellees and avoided a Texas state court trial. Though we assume that the district court improperly denied the cattlemen's motion to remand, jurisdiction was properly vested in the district court by the time of trial and judgment. Because a finding that the district court lacked jurisdiction would result in an inefficient loss of judicial economy, <u>Caterpillar</u> allows a finding of jurisdiction regardless of the assumed lack of diversity at the time of removal. The cattlemen's failure to rejoin Cannan as a non-diverse party prior to trial prevented this loss of efficiency and vested the district court with diversity jurisdiction.

20

The cattlemen's complaints regarding the "Dangerous Food" broadcast of the Oprah Winfrey Show presented one of the first opportunities to interpret a food disparagement statute. The insufficiency of the cattlemen's evidence, however, renders unnecessary a complete inquiry into the Act's scope. Finally, this court can find no plain error in the district court's instructions regarding the business disparagement claim.

**AFFIRMED.**

ENDRECORD

EDITH H. JONES, Circuit Judge, concurring:

While I acknowledge that our court's opinion may assume without deciding the applicability of the False Disparagement of Perishable Food Products Act, I have become convinced that the district court's interpretation of the Act was wrong. Plaintiffs suing under the Act should not have to prove, as a threshold to coverage, that their particular products may decay "beyond marketability" within a limited period of time. The purpose of the statute's definition is to distinguish perishable from processed food products, not to eliminate protection for some of the farmers and ranchers for whom the statute was intended. The statute contains several high hurdles to liability; this is not one of them.

Under the Act, a person may be held liable for damages sustained by the producer of a perishable food product if that person knowingly disseminates false information to the public stating or implying that the producer's product is not safe for public consumption. See Tex. Civ. Prac. & Rem. § 96.002. This litigation represents one of the first applications of the Act. At trial, the parties disputed whether appellants' live cattle are a "perishable food product" protected under the Act. The court held that they are not.

To support the position that their live cattle constituted a "perishable food product," the cattlemen introduced evidence that cattle fattened in a feed lot must be sold when they

reach their marketable weight.[12]  After the marketable weight is reached, the cattle begin to put on extra fat.  This extra fat devalues the cattle, reduces their selling price, and costs the rancher in excess feed.  Although a "maintenance feed" can be used to maintain cattle weights, this feed reduces marbling in the beef, toughens the beef, and, again, decreases the cattle's value. Cattle remain at their marketable weight for only a brief period of time.  Indeed, the district court found, and the appellees apparently concede, that cattle begin to diminish in value once they have passed their marketable weight.  <u>See</u> 11 F. Supp. 2d at 863.

While recognizing this diminution in value, the district court found that live cattle do not decay "beyond marketability" because they may still be sold for uses other than USDA prime beef -- e.g., hamburger or dog food.  This interpretation, however, would seem to vitiate the applicability of the statute to food products that were undoubtedly intended to fall within the protective reach of the Act.  For example, bananas are undoubtedly a food product that will decay over time.  Yet, bananas with brown spots have uses beyond consumption as fresh bananas -- e.g., when

---

[12]    Cattle are placed in feedlots for an average of 120-150 days.  During this time, their weight increases to the optimal range of 1,100 to 1,150 pounds. Once at this "finish weight," the cattle must go to market within the next few days or weeks lest their price decline.  By comparison, apples -- clearly intended to constitute a perishable food product under the Act -- may be stored between six and 11 months before they decay beyond marketability.  <u>See</u> Agricultural Research Service, U.S. Dep't of Agric., <u>Agricultural Handbook No. 66</u>, "The Commercial Storage of Fruits, Vegetables, and Florist and Nursery Stocks" 31 (1986).

processed in banana bread and certain non-food uses. The Act, properly construed, does reach fed cattle.

The appellees' interpretation that the Act was not intended to cover live cattle is inconsistent with the statute's language and legislative history. A perishable food product is "a food product of agriculture or aquaculture that is sold or distributed in a form that will perish or decay beyond marketability within a limited period of time." Tex. Civ. Prac. & Rem. § 96.001. First, the statute places no limit on the term "agriculture," which the dictionary defines as "the science or art of cultivating the soil, harvesting crops, and raising livestock." Webster's Third New International Dict. (1981). Raising cattle, an agrarian occupation, is within the language of the statute; fed cattle are "beef on the hoof," hence, a food product. Moreover, beef is "a food product of agriculture" and is "distributed in a form" that is perishable. The district court's denial of coverage to live fed cattle overlooks this aspect of the statutory definition. Reinforcing coverage of fed cattle is the fact that the statute covers aquaculture, presumably including the cultivation of oysters, shrimp, or catfish. An act designed to protect production of aquatic animals for food, a relatively new Texas industry, could not have meant to exclude cattle-raising, which is intimately bound with Texas's history and current economy.

The legislative history supports the cattlemen's position that live cattle are covered by the Act. See House Comm. on Agric. and Livestock, Bill Analysis, Tex. H.B. 722, 74th Leg. (1996)

24

(statute would "help ensure that any claim about the safety of a perishable . . . meat . . . is based upon facts"); see also id. (noting necessity for protecting products given "the short amount of time to harvest and market perishable agricultural . . . food products" (emphasis added)).

Even if the cattlemen had to show that their cattle would "decay beyond marketability," I believe, contrary to the district court, they did do so. The evidence adduced at trial demonstrates that live cattle appear to decay steadily in value from their optimum date of sale (perish beyond marketability) just as an apple hanging from a tree might rot. That the decay occurs pre-slaughter does not detract from the protections of the statute. An apple will rot on the tree as easily as it will rot in the grocer's produce section.

The district court's interpretation overlooks that the Act was passed to prohibit the dissemination of false information claiming a food product "is not safe for public consumption." Tex. Civ. Prac. & Rem. § 96.002 (emphasis added). Under the district court's interpretation, it might be argued that a food product would never decay beyond marketability so long as some market, even a non-food or non-human market, existed for the product. Such an interpretation, however, would directly contradict the legislature's intention as it would imperil claims even of Texas grapefruit or onion growers, if their product had any residual "marketability" following a trumped-up product scare.

25

The district court's reasoning mandates that whether an agricultural or aquaculture product falls within the Act is a significant threshold factual issue in each case. In other words, under the district court's interpretation, a producer or distributor would be required to prove -- to establish liability -- that <u>his</u> product decayed beyond marketability in a limited period of time. The appellees seize upon this requirement, citing the "mere" 11% decrease in market price for fed cattle following the "Dangerous Food" program and the lack of evidence establishing that <u>these cattlemen's products</u> went unsold at market. Their evidence persuaded the district court that the cattlemen should be barred from recovery under the Act.

This interpretation of the statute is irreconcilable with the legislature's purpose. Food disparagement acts, or "Veggie Libel Laws," are designed to prevent false information from flooding and then destroying the market for a perishable food product. <u>See</u> Timur Kuran & Cass R. Sunstein, <u>Availability Cascades and Risk Regulation</u>, 51 Stan. L. Rev. 683, 749-51 (1999).[13] Once a product falls within the definition of a "perishable food product," that product is protected. The definition of perishable foods distinguishes the direct products of agriculture and

_____

[13] As defined by Timur and Sunstein, an availability cascade is a "self-reinforcing process of collective belief formation by which an expressed perception triggers a chain reaction that gives the perception increasing plausibility through its rising availability in public discourse." <u>See</u> <u>Availability Cascades and Risk Regulation</u>, 51 Stan. L. Rev. at 683. The authors explicitly define the behavioral bases for food product disparagement laws, <u>see</u> <u>id.</u> at 705-36, and discuss the impact of the media's dissemination of false, or valid, information and the effect of this circulation on the public. <u>See</u> <u>id.</u> at 734-36.

aquaculture, broadly speaking, from highly processed foods. The legislature clearly intended to differentiate between agribusinesses that produce "fresh" food products from, say, the makers of biscuit mixes or lasagne as the objects of statutory protection. Defining the products of agriculture should be easy in most instances and should put publishers as well as producers on notice of its scope. The district court's requirement of a fact-intensive inquiry into the scope of coverage disadvantages all parties.

The Act, as I interpret it, shields the market for the perishable agricultural or aquaculture food product, not an individual producer's product. While a producer's recovery may be limited or its damages nonexistent, the product itself is protected from false statements. Thus, the potential inability of the cattlemen to prove that their cattle decayed beyond marketability is a question of damages for the trier of fact. On the other hand, the scope of the Act and whether cattle constitute a "perishable food product" remain questions of law that the court must determine pursuant to the rules of statutory construction. In its inquiry, a court must determine if a product could decay beyond marketability, as opposed to whether that product did decay. The former is a question of law concerning the scope of the statute, the latter a question of fact concerning damages.

I respectfully differ with the excellent district court judge on this matter.

27